Willie SMITH, Plaintiff,

v.

Norman BUTLER, Defendant.

Civ. A. No. 86–3273–WD.

United States District Court, D. Massachusetts.

Sept. 23, 1988.

---

Willie F. Smith, Norfolk, Mass., pro se.

William L. Patton, Ropes & Gray, Boston, Mass., for plaintiff.

Linda G. Katz, Asst. Atty. Gen., Criminal Bureau, Boston, Mass., for defendant.

MEMORANDUM

WOODLOCK, District Judge.

Instructing the jury in a murder case sixteen years ago, a Massachusetts state superior court judge defined the concept of reasonable doubt by employing forms of explanation which are now recognized as erroneous in the federal courts of this Circuit. The question whether the errors in his reasonable doubt instruction justify a new trial has been presented by the defendant to the state courts without success. The issue comes before me belatedly through the state habeas corpus jurisdiction of the federal courts, 28 U.S.C. § 2254. Under controlling case law, I must find the instructional errors to be serious. However, under controlling case law I must also find them constitutionally tolerable and so decline to grant the writ.

I

The petitioner, Willie F. Smith, was convicted on February 17, 1973, of murder in the second degree. He was sentenced to life imprisonment.

Mr. Smith's direct appeal was never perfected. However, in 1979, he filed a motion for a new trial on the same basic grounds now raised in this petition for habeas corpus. He argued then, as he does now, that in instructing the jury as to proof beyond a reasonable doubt, the trial judge trivialized the Commonwealth's burden of proof by drawing improper analogies between proof beyond a reasonable doubt and the quantum of assurance necessary before the jurors would make various important decisions in their personal lives.

The petitioner's motion for a new trial was denied in the Superior Court and that decision was affirmed by the Supreme Judicial Court ("SJC"), which considered the charge as a whole in connection with his appeal from the denial.[1] *Commonwealth*

---

1. Narrowly read, the challenge contained in the petitioner's *pro se* initiatory pleading here was only to the "important decision" analogy in the reasonable doubt instruction. Petitioner's counsel, appointed after this action was initiated, have ably briefed his challenge to the reasonable doubt instruction from a broader perspec- tive. In light of the fact that the Supreme Judicial Court chose to consider the charge as a whole and given the principle that an alleged deficiency in a jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge," *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400,

*v. Smith,* 381 Mass. 141, 145–46, 407 N.E. 2d 1291 (1980). In the instant habeas corpus petition filed some six years after the rejection of his contentions by the SJC, Mr. Smith maintains that the Massachusetts courts committed constitutional error by countenancing instructions which placed the Commonwealth's burden of proof in his criminal case below the standard required by *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

## II

### A

In its opinion, the SJC concisely summarized certain of the evidence at the joint trial of Mr. Smith and his co-defendants Hubert Bonds and Willie J. Scott:

The homicide occurred at the R & P Restaurant in Springfield on June 11, 1972. The Commonwealth offered as its principal witness Mrs. Esther Shaw. The victim Edward Shaw was the brother-in-law of Mrs. Shaw. Mrs. Shaw and her husband Henry owned the restaurant. They were working at the restaurant, along with Edward Shaw and John Carroll, at the time of the shooting. Mrs. Shaw testified that at approximately 10 p.m. on June 11, 1972, Willie F. Smith entered the kitchen of the R & P Restaurant. Shortly after this, Hubert Bonds and Willie J. Scott also walked into the kitchen.

Mrs. Shaw testified that a conversation took place between her and Smith while they were in the kitchen. Scott then pulled out a gun. Both Smith and Bonds also pulled out guns. Henry Shaw then left the kitchen, and as he was leaving he handed a gun to Edward Shaw, who was entering the kitchen.

Mrs. Shaw testified that Bonds then shot at Edward Shaw, and Shaw fell to the floor. Furthermore, she testified that after the first shot, Smith said to Bond[sic]: "Kill that son-of-a-bitch."

Bonds walked over to Edward Shaw and shot him once again. Bonds, Smith, and Scott then left the restaurant. Mrs. Shaw picked up the gun which was at Edward Shaw's side. Mrs. Shaw fired a shot into the area above the kitchen door. She then ran into the street where she fired the gun until it was empty.

Bonds testified before the jury that he went to the R & P Restaurant on June 11, 1972, along with Smith and Scott, in order to buy liquor. Bonds stated that while he was in the kitchen purchasing liquor, Edward Shaw pointed a gun at Bonds and fired it twice. Bonds stated that he fired his gun in return.

Smith testified before the jury that he was not in the kitchen at the time of the shooting. Furthermore, Smith stated that when the shooting started, he left the restaurant by way of the front door. Smith testified that he was joined outside by Bonds and Scott, and the three men drove away in Scott's car. Bonds was driven to the Wesson Memorial Hospital where he was treated for a gunshot wound to the left arm. A ballistics expert testified for the Commonwealth that in his opinion the spent projectile removed from Bonds' left arm was fired from Bonds' gun.

*Commonwealth v. Smith,* 381 Mass. at 142–43, 407 N.E.2d 1291.

### B

The SJC's concise summary of the evidence set forth above puts the case in the light most favorable to the prosecution. This is not surprising because the Court's summary is virtually a verbatim recitation —with only citations and introduction omitted—of the entire "Statement of the Facts" contained at page 3 through 6 of the Brief for the Commonwealth. But recourse to the Commonwealth's narrative—appropriated by the state court—elides certain other relevant evidence available in the trial record.[2]

38 L.Ed.2d 368 (1973), I will address his claim from that broader perspective. *See generally Lanigan v. Maloney,* 853 F.2d 40, 42–45 (1st Cir.1988).

2. The recitation of this additional evidence is not intended to displace the state court's preeminent fact finding role. *See generally* 28 U.S.C. § 2254(d); *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986).

While circumstantial evidence supported the Commonwealth's case, the prosecution of Mr. Smith essentially involved a credibility contest between Mrs. Shaw and Mr. Smith. The SJC's concise narrative summary does not make clear that Mrs. Shaw was the only witness who claimed to have seen Mr. Smith in the kitchen after the first shot when, according to Mrs. Shaw, Smith directed Bonds to kill Edward Shaw. All of the other witnesses—including John Carroll, an employee at the restaurant, who testified on behalf of the Commonwealth—either did not directly observe where Mr. Smith was at the time of the killing, or placed him outside of the kitchen.

No one other than Mrs. Shaw heard Mr. Smith issue the specific directive: "Kill the son-of-a-bitch." Mr. Carroll testified that he had been outside of the kitchen at the time of the gunfire and had merely heard a voice he could not identify say, "Kill him," after the first shot.

Mr. Smith thus was convicted primarily on the direct evidence of Mrs. Shaw; and the trial record suggests that Mrs. Shaw was not without bias against Mr. Smith. The jury heard evidence that the shooting was preceded by an argument among Mrs. Shaw, Mr. Shaw and Mr. Smith.[3] Moreover, Mrs. Shaw, who was impeached with a prior statement to the police regarding details of the events, conceded during cross examination that when the various guns were drawn she was distracted by events:

> At this time I wasn't paying too much attention. The gun dropping on the floor and one pointing one and the other one getting his out, and I couldn't tell who was doing what at this point.

For his own part, the 35–year–old Mr. Smith would hardly have made an impressive witness. He had spent the first 25 years of his life in rural Georgia, had gone no farther than seventh grade in school and was unable either to read or write. The transcript of his answers at trial discloses a person ill at ease with formal English. He worked making cinder blocks outside Hartford but had spent the day of the incident in Springfield drinking with relatives, friends and acquaintances.

Mr. Smith's limited inherent credibility was further undermined by the introduction in evidence of a statement he made without Miranda warnings and then "signed"—by placing his mark on it—the day after the killing. The statement indirectly suggested that Smith may have been in the kitchen at the time of the killing. The statement was introduced in evidence with a limiting instruction that it be considered not for its truth, but only for its bearing upon Mr. Smith's credibility.

Obviously the members of the jury chose to believe that Mrs. Shaw—who apparently was pregnant when she testified—had not lied or otherwise overstated her testimony; but upon this evidence they could also have come to the opposite conclusion and reasonably have entertained doubt about her story.

I have elaborated upon evidence at Smith's murder trial to illustrate the context in which jury instructions were received in this case. Because the case turned largely on the credibility of two witnesses, the jury's understanding of the quantum of proof necessary to convict was critical to the outcome of the trial. Consequently, the customary role of the concept of "reasonable doubt" in a jury instruction was enhanced at Mr. Smith's trial.

### III

Quite apart from its role in this case, the importance of the concept of reasonable doubt in our criminal jurisprudence cannot be overemphasized. The Supreme Court in modern times has been satisfied to reit-

---

Rather what follows in the text is designed to identify the other evidence to which the jury was or could have been exposed in addition to that set forth in the SJC's narrative.

**3.** Evidence excluded at trial also suggested that prior to the encounter in the restaurant there had been an ongoing dispute involving Mr. Smith, Mr. and Mrs. Shaw and Mrs. Shaw's sister, Cleo Gordon. At the time of the killing, Mr. Smith apparently lived in Hartford, Connecticut, where he was a tenant of Mrs. Shaw's sister.

erate this importance by quoting from venerable [4] text:

> The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law."

*In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) quoting *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895).

For the First Circuit, "[d]iscussion of the concept is perhaps the most important aspect of the closing instruction to the jury in a criminal trial." *Dunn v. Perrin,* 570 F.2d 21, 25 (1st Cir.), *cert. denied* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978). *See also Lanigan v. Maloney,* 853 F.2d at 48.

In this case, the discussion of that vitally important concept was pock-marked with imperfection. The instruction on reasonable doubt given at Mr. Smith's murder trial, which the Supreme Judicial Court found to be without error when considered as a whole,[5] contained five formulations which have been disapproved by the First Circuit: (A) reasonable doubt was equated with "proof to a moral certainty;" (B) moral certainty was defined as being present when a juror "is so fully convinced that [i] he would act on his own conviction [ii] in matters of the highest importance concern-

---

**4.** A brief history of the incorporation of the reasonable doubt standard in Anglo–Saxon jurisprudence, beginning in the eighteenth century, is found in Gregory, *Whose Reasonable Doubt? Reconsidering the Appropriate Role of the Reviewing Court in the Criminal Decision Making Process,* 24 Am.Crim.L.Rev. 911, 913–917 (1987).

**5.** The instruction on reasonable doubt provided:

"Now, what do we mean when we speak of proof beyond a reasonable doubt. Reasonable doubt has been defined in numerous ways. It has been said, for example, that a reasonable doubt means such doubt as remains in the mind of a reasonable man or woman who is earnestly seeking the truth. It has been said sometimes that a reasonable doubt is a doubt for which a good reason can be given. But the most common definition of proof beyond a reasonable doubt, and reference has been made to it, is that a proof beyond a reasonable doubt means proof to a moral certainty. And a juror may be said to be morally certain when he is so fully convinced that he would act on his own conviction in matters of the highest importance concerning his own affairs. Anything short of such conviction would mean that the Commonwealth has not proved the offense beyond a reasonable doubt.

"But proof beyond a reasonable doubt does not mean proof beyond all doubt, nor beyond an imaginary doubt, or beyond a doubt without reason. It does not mean such doubt as might exist in the mind of a person earnestly seeking for doubt nor an excuse to acquit a defendant. Proof beyond a reasonable doubt, in other words, does not mean absolute proof or proof to a mathematical certainty, if there is such a thing. But rather proof that convinces you as reasonable people earnestly seeking the truth that the defendant is guilty. But if when all is said and done, after considering all of the evidence, there remains in the mind of the juror any reasonable doubt of the existence of any fact which is essential to the guilt of a defendant on a particular charge, then the duty of the jury is to resolve that doubt in favor of the defendant and to find him not guilty.

"Now, I said a moment ago that proof beyond a reasonable doubt means proof to a moral certainty, and that a juror may be said to be convinced to a moral certainty when he would act on his convictions in matters of highest importance concerning his own affairs. I think it is useful to give some illustrations or examples of what we mean by that.

"All of you had at one time or another in the course of your lifetime have had to make major decisions. The decision, for example, to marry or not to marry; the decision perhaps to buy a home or not to buy a home; the decision to change jobs after having held one job for a long period of time; and perhaps some of you have made the decision to retire or not to retire. These are major decisions that one has to make in the course of a lifetime. Not the everyday decision, what I am going to have for lunch today or what I am going to watch on television tonight. But major decisions. You have had to make them and you had. You married or you didn't marry. You bought the house or did not buy the house. You changed jobs or you didn't change jobs. You retired or you didn't retire. You are not always one hundred per cent sure that you were making the right decision, but you made it. You were sufficiently convinced it was the right decision to make, so you took that path. You were convinced to a moral certainty and this is the type of conviction that we speak of when we speak of proof beyond a reasonable doubt."

ing his own affairs"; (C) given as examples of such matters were whether to marry, whether to buy a home, whether to change jobs and whether to retire; and (D) reasonable doubt was equated with "a doubt for which a good reason can be given."

### A

A clear and unavoidable conflict exists between federal and state courts in Massachusetts over the use of the term "moral certainty" in defining reasonable doubt. The First Circuit has just revisited this conflict in a decision granting a writ of habeas corpus in a case in which a Massachusetts state trial judge equated absence of reasonable doubt with "a degree of moral certainty." *Lanigan v. Maloney*, 853 F.2d 40 (1st Cir.1988).

The "moral certainty" formulation has been rejected as a general proposition consistently by the First Circuit in modern times. In *United States v. Del Toro Soto*, 676 F.2d 13, 17 (1st Cir.1982), the Court observed, "We have been ... emphatic in our condemnation of the 'moral certainty' language." Three months later in *United States v. Drake*, 673 F.2d 15, 21 (1st Cir. 1982), the Court reiterated the proposition that "our disapproval of moral certainty language is by now well-settled," and adjured trial judges to "eschew 'moral certainty' phraseology."

Shortly after these pronouncements, in *United States v. DeWolf*, 696 F.2d 1, 4 (1st Cir.1982), a Massachusetts federal district judge who used moral certainty language in a 1981 charge felt the lash of appellate disapproval when the First Circuit noted: "[I]n the three years prior to January, 1981 we had written at least six opinions criticizing these instructions. We deplore that this should be wasted effort."

In *DeWolf* Judge Aldrich metaphorically traced the genealogy of the offensive language to a superseded entry in Devitt & Blackmar's Modern Federal Jury Instructions. *Id.* at 4. The lineage of the moral certainty language in Massachusetts is, however, both more distinguished and more ancient.

As the First Circuit observed recently in *Lanigan*, the use of moral certainty language in Massachusetts reasonable doubt instructions was given definitive approval by Chief Justice Lemuel Shaw in *Commonwealth v. Webster*, 59 Mass. (5 Cush.) 295, 320 (1850). *Webster* provides "a long standing formulation repeatedly approved by the Massachusetts Supreme Judicial Court." *Lanigan*, 853 F.2d at 41. And—to adopt Judge Aldrich's alternative metaphor in *DeWolf*—the moral certainty language, cultivated by Chief Justice Shaw in *Webster*, is the hardiest and longest lived weed in the Massachusetts trial judge's perennial garden of reasonable doubt instructions.

Despite long standing,[6] continuing and current[7] dissatisfaction by the First Circuit with moral certainty formulations, *Lanigan*, 853 F.2d at 47 n. 4 ("We repeatedly

---

6. Doubts about the usefulness of moral certainty language in defining reasonable doubt appeared in Supreme Court cases over 100 years ago. Observing that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury," the Court in *Miles v. United States*, 103 U.S. 304, 312, 26 L.Ed. 481 (1881) nevertheless countenanced a charge using a "moral certainty" explanation. "The language used in this case, however, was certainly very favorable to the accused, and is sustained by respectable authority," the *Miles* court noted in citing *Commonwealth v. Webster* as the first such authority.

Seven years later, however, the respectability of moral certainty language had worn thin. Justice Field took the occasion for the unanimous Court in *Hopt v. Utah*, 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708 (1887) to dismiss the

"moral certainty" language from *Commonwealth v. Webster* gratuitously in a case in which the language had not even been used. "The difficulty," Justice Field observed, "is that the words 'to a reasonable and moral certainty' add nothing to the words 'beyond a reasonable doubt'; one may require explanation as much as the other." *Id.* at 440, 7 S.Ct. at 619.

7. It should be noted, however, that most recently the First Circuit, after a careful dissection of the verbatim *Webster* charge in *Lanigan*, found "it hard to imagine, without recourse to prolixity, a charge more reflective of the solemn and rigorous standard intended," 853 F.2d at 43, despite its use of "moral certainty" language which has been emphatically and repeatedly condemned and deplored during the last ten years by that court.

have criticized the practice of defining reasonable doubt in terms of 'moral certainty,' ..."), the Massachusetts state courts have shown no disposition to abandon its use. The *Webster* definition of proof beyond a reasonable doubt as proof to a moral certainty has been incorporated in Instructions 2.05 and 2.051 of the newly published Model Jury Instructions for Use in the (Massachusetts state) District Court—1988 Edition ("Massachusetts Model Jury Instructions").[8]

As one Massachusetts Superior Court Judge put it in a charge later affirmed by the Supreme Judicial Court, " '... trial judges are reminded a couple times a year by the Supreme Court as we labor with people like yourselves and try to explain this concept [of "beyond a reasonable doubt"], that we, no matter how we try, we can't improve upon the language [i.e. "moral certainty"] set forth 130 years ago [in *Webster*].' " *Commonwealth v. Sheline*, 391 Mass. 279, 293 n. 4, 461 N.E.2d 1197 (1984). Indeed, the use of "moral certainty" as a means of defining proof beyond a reasonable doubt seems to have something approaching a talismanic effect in the Massachusetts state courts, saving otherwise problematic jury instructions from causing reversals of criminal convictions.[9]

When petitioner's case was before the Supreme Judicial Court, such an effect was

---

8. Elsewhere within the First Circuit moral certainty language has also been incorporated in model instructions for the courts of the Commonwealth of Puerto Rico. *See People v. Rodriguez Colon*, 95 P.R.R. 603 (1967). The current book of Instruction for Jurors in Superior Court, assumed to be correct by Order of the Supreme Court of Puerto Rico, 34 L.P.R.A., App. II, R. 137, uses *Rodriguez Colon* as an annotation and refers to "... una firme conviccion o certeza moral ..." ("a firm conviction or moral certainty"). Instrucciones al Jurado Para El Tribunal Superior de Puerto Rico 42 (1976).

9. *See, e.g., Commonwealth v. Morse*, 402 Mass. 735, 737, 525 N.E.2d 364 (1988) (incorrect instruction is saved "by the clear caveat that 'the evidence must be the truth of the facts to a reasonable and moral certainty' "); *Commonwealth v. A Juvenile*, 396 Mass. 215, 217–19, 485 N.E.2d 170 (1985) ("obvious misstatement" that "proof required to sustain a conviction 'is not proof beyond all reasonable doubt' " is saved, in part, by charge's use of moral certainty definition of prosecution's burden of proof); *Commonwealth v. Lanoue*, 392 Mass. 583, 467 N.E.2d 159 (1984) (error in instructing jurors that reasonable doubt is doubt for which good reason can be given was not reversible in light of other instructions including one defining reasonable doubt in terms of moral certainty); *Commonwealth v. Tavares*, 385 Mass. 140, 147–48, 430 N.E.2d 1198 cert. denied, 457 U.S. 1137, 102 S.Ct. 2967, 73 L.Ed.2d 1356 (1982) (no substantial likelihood of miscarriage of justice, in a case reviewed under Mass.Gen.L. ch. 278, § 33E, where judge stated five times that the Commonwealth had the burden of proving every essential element of the crime beyond a reasonable doubt, and defined reasonable doubt in the language of *Commonwealth v. Webster* ); *Commonwealth v. Spann*, 383 Mass. 142, 150–151, 418 N.E.2d 328 (1981) (no error where judge charged jury on presumption of innocence and stated that proof beyond a reasonable doubt required proof to a moral certainty on each element of crime charged); *Commonwealth v. Carballo*, 381 Mass. 227, 229, 407 N.E.2d 1295 (1980) (no cause for reversal under § 33E, where defendant took no exception to charge, and where judge charged in detail on presumption of innocence, repeatedly charged that Commonwealth bore the burden of proof, and defined reasonable doubt in terms of moral certainty); *Commonwealth v. Hughes*, 380 Mass. 596, 600–601, 404 N.E.2d 1246 (1980) (charge using moral certainty language not so one-sided as to present a substantial risk of miscarriage of justice; *Commonwealth v. Williams*, 378 Mass. 217, 231–235, 391 N.E.2d 1202 (1979) (no grave prejudice to defendant, and no error in instructions, where judge admonished jury that no innocent person be convicted or punished, defined reasonable doubt in terms of moral certainty and in language of *Commonwealth v. Webster*, and employed the unadorned phrases "reasonable doubt" and "moral certainty" in forming specific questions for decision); *Commonwealth v. Seay*, 376 Mass. 735, 745–746, 383 N.E.2d 828 (1978) (no error in instruction which defined reasonable doubt negatively, where judge also defined reasonable doubt in terms of "moral certainty" and a "clear and settled conviction"); *Commonwealth v. Lovell*, 6 Mass.App.Ct. 172, 179, 374 N.E.2d 318 (1978) (problematic charge saved by fact that "judge specifically emphasized to the jury the requirement of 'moral certainty' in reaching a decision"). *But see Commonwealth v. Kelleher*, 395 Mass. 821, 826, 482 N.E.2d 804 (1985) ("The judge's allusion to 'proof to a moral certainty' did not suffice to repair the defective instructions as to reasonable doubt"); *Commonwealth v. Rembiszewski*, 391 Mass. 123, 134, 461 N.E.2d 201 (1984) ("the jury were instructed to treat proof beyond a reasonable doubt, proof to a moral certainty, and proof to a degree of certainty that the jurors would want in making decisions about their futures as equivalent concepts. This was constitutional error").

apparent. In approving the challenged instruction, the Court noted, "There was emphasis on moral certainty as a definition of the Commonwealth's burden, in language substantially similar to instructions which we have approved in the past." *Commonwealth v. Smith*, 381 Mass. at 146, 407 N.E.2d 1291. In fact, the decision in *Smith* has become something of a standard against which to measure the state court's reasonable doubt charges. The Massachusetts Appeals Court has, for example, upheld "instructions ... practically identical with those found acceptable in *Commonwealth v. Smith*," noting that "[t]he distinguishing characteristic of the charge here, as in *Smith*, is that the emphasis at the beginning and the end of discussion of reasonable doubt is on moral certainty...." *Commonwealth v. Gonzales*, 18 Mass. App.Ct. 979, 980, 470 N.E.2d 403 (1984), *review denied*, 393 Mass. 1106, 474 N.E.2d 182 (1985).

The First Circuit in *Lanigan* acknowledged that although it had repeatedly criticized "the practice of defining reasonable doubt in terms of 'moral certainty'," it had "not found use of the phrase to be constitutional error." 853 F.2d at 47 n. 4. Indeed the First Circuit appears to have endorsed the verbatim *Webster* charge despite its moral certainty language. *See* Note 7, *supra*. However, the First Circuit did find constitutional error in *Lanigan*, where the trial judge strayed from the traditional *Webster* formulation in presenting "moral certainty" language. The court observed that "the context of the *Webster* charge lessens the potential for any harmful inferences to be drawn by the jury [but] the use of the phrase '*to a degree of* moral certainty,' particularly without the *Webster* context, is substantially more problematic." *Id.* (emphasis in original). After analyzing what Judge Skinner accurately identified in the District Court in *Lanigan* as a "confused and confusing" reasonable doubt instruction, the First Circuit found

> the entire thrust of the reasonable doubt charge was to de-emphasize the strength of what is supposed to be a very strong standard, potentially depriving petitioner of perhaps his most important protection against an improper verdict.

*Id.* at 48.

In short, "moral certainty" language remains a weak and disfavored reed upon which to construct a reasonable doubt instruction acceptable to the First Circuit. *Lanigan* teaches that in order to avoid constitutional error, "moral certainty" definitions must be fully buttressed by a carefully chosen collection of acceptable explanations rather than overburdened by additional misformulations of the definition of reasonable doubt.

## B

### (i)

The definition of lack of reasonable doubt as a state of mind existing when a juror "would act on his convictions," was described as objectionable by the First Circuit in *United States v. Del Toro Soto*, 676 F.2d at 17, with the observation that "we, along with other circuit courts, have strongly suggested that the district court should follow the teaching of *Holland v. United States*, 348 U.S. 121, 140' [75 S.Ct. 127, 138, 99 L.Ed. 150] (1954), and use the phrase 'hesitate to act' rather than 'willing to rely and act upon.'" [10] *See also Com-*

---

10. Strictly speaking the concern in *Holland* was with the nonsensical quality of the instruction there under review. But in the wake of *Holland* the "hestitate to act" formulation has emerged, at least in the First Circuit, as preferred even when the "willing to act" formulation is also logically applicable. As the First Circuit explained in *United States v. Drake*, 673 F.2d at 20 n. 5:

> Some courts appear to have misunderstood the Supreme Court's concern in *Holland.* There the charge under attack was one which defined reasonable doubt as "'the kind of

doubt ... which you folks in the more serious and important affairs of your own lives might be willing to act upon.'" *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 139, 99 L.Ed. 150 (1954) (emphasis added). This instruction is manifestly wrong as it turns the reasonable doubt standard on its head. Since *Holland,* the charge under scrutiny by the courts has uniformly defined *proof* beyond a reasonable doubt as that on which a person might be willing to act. Although still dubious, this at least makes sense, compared with

*monwealth v. Lovell,* 6 Mass.App.Ct. at 178–79, 374 N.E.2d 318 (describing as "undesirable" a sentence in a charge "referring to the Commonwealth's duty to supply such proof as you would be willing to rely upon and act upon in the most important decisions of your own affairs").

But the "willing to act and rely" formulation is not wholly rejected in all federal courts. The Fifth and Eleventh Circuits, for example, have incorporated both sides of the coin with model instructions defining reasonable doubt as doubt the prosecution must overcome by proof of such a convincing character that jurors "would be willing to rely and act without hesitation." Fifth Circuit Pattern Jury Instruction 3A, 3B (Basic Instruction); Eleventh Circuit Pattern Jury Instruction No. 3 (Basic Instruction).

Nor do the Massachusetts state courts necessarily reject that formulation. In one of the leading Massachusetts cases on reasonable doubt instructions, *Commonwealth v. Garcia,* 379 Mass. 422, 399 N.E.2d 460 (1980), the SJC distinguished the federal approach on the "hesitate to act"/"willing to act" formulation after implicitly finding that definition of "beyond a reasonable doubt" as "that type of sureness that compelled you to act when you, yourself, had to make important decisions" was not constitutionally significant error.

(ii)

Whether the introduction is "hesitate to act" or "willing to act and rely," equating absence of reasonable doubt with the degree of certainty which attends important decisions in a juror's life is not looked upon with favor by the First Circuit. In *Dunn v. Perrin,* 570 F.2d at 24, the First Circuit "note[d] that comparison of reasonable doubt in criminal cases with the standard employed by jurors to make even the most significant decisions in their daily lives has been criticized for its tendency to trivialize the constitutionally required burden of proof."

The Federal Judicial Center in its Pattern Jury Instruction has rejected use of the "hesitate to act" language precisely because of its association with important life decisions.

> In the decisions people make in the most important of their own affairs, resolution of conflicts about past events does not usually play a major role. Indeed decisions we make in the most important affairs of our lives—choosing a spouse, a job, a place to live, and the like—generally involve a very heavy element of uncertainty and risk taking. They are wholly unlike the decisions jurors ought to make in criminal cases.

Federal Judicial Center Criminal Pattern Instructions, No. 21 at 29 (1987 ed.).

Again, however, on this point there is no unanimity even in the federal courts. The leading collection of federal jury instructions chose after explicit consideration to make use of a general reference to "the most important of [a reasonable person's] affairs." L. Sand *et al.,* Modern Federal Jury Instructions ¶ 4.01, Instruction 4–2 (1988). The commentary observes that the related " 'hesitate to act' language was included in the text because it appeals to common sense, which jurors should be urged to use." *Id.* at p. 4–10. In this the Modern Federal Jury Instructions echo a view voiced over one hundred years ago when the United States Supreme Court endorsed an instruction illustrating reasonable doubt "by reference to the conviction upon which the jurors would act in the weighty and important concerns of life [as] likely to aid them to a right conclusion, when an attempted definition might fail." *Hopt v. Utah,* 120 U.S. at 441, 7 S.Ct. at 619.

Currently, model instructions from the Fifth, Ninth and Eleventh Circuits continue to allude to critical life choices variously described as "the most important of your own affairs," Fifth Circuit Pattern Jury Instructions Nos. 3A and 3B (Basic Instructions); *idem,* Eleventh Circuit Pattern Jury Instructions No. 3 (Basic Instruction); and the "most important decisions in his or her

acting-in-reliance-on-a-doubt as criticized in *Holland.*

own life," Ninth Circuit Model Jury Instructions No. 3.04.

For the Massachusetts state courts "[t]he constitutionally significant error, if any, [in such an instruction] is not that it refer[s] to important decisions in the jurors' daily lives," *Commonwealth v. Garcia*, 379 Mass. at 440, 399 N.E.2d 460.[11] Rather the problem is with the use of specific examples to illustrate *the general* reference. *Id.* As the *Garcia* court noted, "state and federal courts, including the United States Supreme Court, have consistently approved general references to the daily lives of jurors." *Id.* at 440 n. 11, 399 N.E.2d 460.[12]

## C

The real danger of important life decision language is that it leads ineluctably to the use of specific examples of such decisions. On the error of this technique for illustrating reasonable doubt, there is agreement. The use of specific examples has been equally and forcefully condemned by Massachusetts federal and state courts. *See, e.g., Grace v. Butterworth*, 635 F.2d 1, 6 (1st Cir.1980), *cert. denied*, 452 U.S. 917, 101 S.Ct. 3053, 69 L.Ed.2d 421 (1981); *Dunn v. Perrin*, 570 F.2d at 24; *Commonwealth v. Garcia*, 379 Mass. at 440–41, 399 N.E.2d 460; *Commonwealth v. Ferreira*, 373 Mass. 116, 129, 364 N.E.2d 1264 (1977).

The specific examples used by the trial judge here have, in fact, been rejected by federal and state courts in Massachusetts. *See, e.g., Grace v. Butterworth*, 635 F.2d at 6 (expressing concern about marriage and house purchase analogies); *Commonwealth v. Garcia*, 379 Mass. at 438–441, 399 N.E.2d 460 (condemning marriage and house purchase analogies).

**11.** It should be noted, however, that the draftsmen for the current version of the Massachusetts Model Jury Instructions have cautioned that:

Although it is not reversible error to analogize reasonable doubt to personal decisions as long as they remain unspecified, ... it is better to avoid even such references since the degree of certainty required to convict is unique to the criminal law, and it may not

## D

In *Dunn v. Perrin*, supra, the First Circuit issued a writ of habeas corpus, in part on the basis of a "good reason" charge, because that formulation improperly equated a "good reason" with "doubt based on reason." The *Dunn* court observed that "[i]nstead of requiring the government to prove guilt, [the charge] called upon petitioners to establish doubt in the jurors' minds." *Id.* at 23–24.

A parallel objection to the "good reason" formulation has been identified by the Ninth Circuit in comments to its Pattern Instructions. The Ninth Circuit instruction as drafted

is not meant to suggest that a doubt must be articulable to be reasonable; the perception of "common sense" may often be inarticulable. In order to avoid the suggestion that a reasonable doubt must be a logical, articulable conclusion or inference, a judge may wish to instruct the jury that a reasonable doubt is one based on "reason *or* common sense."

Ninth Circuit Pattern Instructions § 3.04 (Comment).

Similarly, the draftsmen of the Massachusetts Model Jury Instructions caution that the Massachusetts "judge should not equate a reasonable doubt with a 'doubt based on reason' ... or with a 'doubt for which good reason can be given' ..." Instruction 2.05 at 4–5 (Notes; citations omitted).

## IV

The First Circuit, as illustrated in section III *supra*, has not been hesitant—even in the face of contrary views by other courts—to inveigh emphatically against certain perceived misformulations in the definition of reasonable doubt. However, that Court

even be possible to make private decisions according to this standard.
Instruction 2.05 at 4 (Notes; citations omitted).

**12.** Elsewhere even within the First Circuit, pattern instructions for state courts in Maine refer to "the significant transactions of life." Alexander, Manual of Jury Procedures and Instructions for Maine, Instruction #110 (1987).

has largely been unwilling to rely and act upon those views by reversing either state or federal convictions. Thus, taken separately, the five questionable components of the charge here under consideration have generally not been found to constitute reversible error, even in the First Circuit. *See e.g., United States v. Indorato,* 628 F.2d 711, 721 (1st Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980) (moral certainty phraseology not plain error); *United States v. Cranston,* 686 F.2d 56, 62 (1st Cir.1982) (willing to act formulation not plain error); *United States v. Sorrentino,* 726 F.2d 876, 883 (1st Cir. 1984) ("comparison of the verdict in a criminal case with the jury's own personal decisions … not … plain error"); *Grace v. Butterworth,* 635 F.2d at 6 (use of life choice analogies not Constitutional error); *United States v. MacDonald,* 455 F.2d 1259, 1263 (1st Cir.), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2073, 32 L.Ed.2d 350 (1972) (good reason formulation not reversible error).

The reluctance to reverse on the basis of discrete portions of a charge which can be considered properly only as a whole is a reflection of the well-established proposition that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

Unlike lengthy jury instructions with but a single misformulation, however, the charge at petitioner's trial involved multiple misformulations of the "most important aspect of the closing instruction to the jury in a criminal case." *Dunn,* 570 F.2d at 25. These operated together to create what the First Circuit—and, in certain instances, other courts—would identify as features of a distorted face to the concept of reasonable doubt. While separately these misformulations may not constitute a reversible misstep, together they create a source of infectious error of sufficient substance to render the entire charge suspect and thereby require further review.

If the instructions challenged by petitioner had been given by a federal district court judge in this Circuit—and had been objected to in a timely fashion at trial—I have little doubt the Court of Appeals would reverse petitioner's conviction on direct review. Moreover, regardless of whether the First Circuit would have reversed petitioner's conviction on a properly predicated direct federal appeal, the instructions would have earned a stern admonition for the federal district court judge. *Cf. United States v. DeWolf,* 696 F.2d at 4.

However, the supervisory review power of the federal circuit court over the federal district courts is far broader than "the more limited habeas corpus review." *Bumpus v. Gunter,* 635 F.2d 907, 910 (1st Cir.1980), *cert. denied,* 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207 (1981). Thus, as the First Circuit recently observed

> even if we might view certain parts of the instructions with askance [sic] were we sitting on direct review in a *federal* criminal case, the standard is quite different in reviewing a *state* proceeding pursuant to our habeas jurisdiction. The degree of prejudice required here is "not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " *Henderson v. Kibbe,* 431 U.S. 145, 154 [97 S.Ct. 1730, 1737, 52 L.Ed.2d 203] (1977) (quoting *Cupp v. Naughten, supra,* 414 U.S. at 146 [94 S.Ct. at 400]).

*Rogers v. Carver,* 833 F.2d 379, 381 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1116, 99 L.Ed.2d 276 (1988).

The First Circuit has acknowledged that it "does not exercise supervisory power over the state courts of Massachusetts; our review of their criminal proceedings is limited to those instances in which 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates (constitutional) due process'." *Grace,* 635 F.2d at 6, citing *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

In approaching a habeas corpus petition brought by a state prisoner pursuant to § 2254, then, it is appropriate to recognize

that, while the federal court of appeals may choose to impose more stringent requirements on the federal district courts, federal appellate admonitions regarding proper instructions are not dispositive unless "the action of the state court was ... contrary to the constitution." *Tsoumas v. State of New Hampshire,* 611 F.2d 412, 414 (1st Cir.1979).

The "ailing instruction" at issue in the instant case was, to be sure, improper for several reasons; but the question on habeas corpus review is whether the impropriety actually infected the entire trial and rendered petitioner's conviction violative of constitutional due process. If it did not, then the challenged instruction was tolerably improper.

In this context it bears emphasizing that federal courts reviewing state convictions must "tolerate a reasonable range of expression, some or even much of which may not suit our fancy." *Bumpus v. Gunter,* 635 F.2d at 910. The more fundamental question is whether the "imperfections in the instant jury charge were ... of such magnitude as to have deprived petitioner of his basic right to be tried and convicted only under the standard of 'proof beyond a reasonable doubt.'" *Id.* at 913.

### A

■ The line that separates intolerably erroneous instructions from tolerable ones apparently lies as a linguistic matter somewhere between the errors that resulted in habeas corpus relief in *Dunn v. Perrin, supra,* and those that failed to amount to constitutional error in *Bumpus v. Gunter, supra.* Thus, the charges in those cases bear some intensive linguistic analysis.[13]

### 1

In *Dunn,* the court held three distinct portions of the trial judge's explanation of reasonable doubt to be erroneous. The three explanations which constituted errors defined reasonable doubt as:

(1) " 'doubt as for the existence of which a reasonable person can give or suggest

a good and sufficient reason'," 570 F.2d at 23;

(2) " '... such a strong and abiding conviction as still remains after careful consideration of all the facts and arguments, ...'" *id.* at 24; and

(3) " '... even in our most important matters, we frequently act upon information which we do not positively know to be absolutely true and which we have no means of verifying, but as to the truth of which we are morally certain. In such instances, there is no reasonable doubt.'" *Id.*

The *Dunn* court regarded all three of these definitions as misstatements, but it especially condemned the second of the three. The second definition was described by the court as "patently erroneous (since) ... [i]nstead of requiring the government to prove guilt, it called upon petitioners to establish doubt in the jurors' minds." It was, therefore, "an inescapable violation of *In re Winship.*" *Dunn,* 570 F.2d at 23, 24.

The court in *Dunn* issued the writ because the "patently erroneous" instruction together with the other two errors had a "cumulative effect ... to obfuscate one of the 'essentials of due process and fair treatment.'" *Id.* at 25.

### 2

In *Bumpus,* on the other hand, the court denied the writ because it regarded the instructional errors to have been something less than of constitutional magnitude. The district court in *Bumpus* found the errors reached constitutional proportions but had denied the writ because it found that they were harmless under the rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966). The First Circuit affirmed the district court's result, but rejected its reasoning.

The Court of Appeals reasoned that the district court's "approach resulted in dignifying as 'constitutional error' flaws in the court's charge which were not of that level of seriousness, and then, in effect, downplaying the concept of constitutional error

---

**13.** The charge recently found defective in *Lanigan* was so confused that comparative analysis

using the *Lanigan* charge would have little, if any, redeeming didactive value.

by holding that it was harmless." *Bumpus*, 635 F.2d at 909. The First Circuit concluded that "[w]hile there were statements in the charge that were better left unsaid, neither singly nor collectively were these flaws so serious as to deny petitioner the fundamental right that his guilt be evaluated under the proper standard." *Id.* at 909–910.

The challenged aspects of the instructions in *Bumpus* concerning "reasonable doubt" were:

(a) The trial court's equation of moral certainty and reasonable doubt, and a description of moral certainty as: " 'being satisfied in your minds and your consciences with the same degree of satisfaction that you would look for when you took action in the major affairs of your life.' " *Id.* at 912.

(b) The use of a specific example to illustrate "moral certainty": " 'I am going to pose to you what I think would be a major affair of your life.

'If you were a young man with a growing family and it was determined that you had a definite deficiency in your heart valve, your surgeon might well advise you that if you had corrective surgery, the heart valve deficiency could be cured and you would live a normal and useful and healthy life.

'He might also advise you that the operation was attendant with great risk, you might not survive the operation, and he also might advise you that if you don't have the operation, you might die at any time, you may live a few years, and you may live a normal life.

'In that situation, you have to make a judgment in the interests of your own health, in the interests of your family and your responsibilities to them. I would say that was a major affair in your private lives.

'[You would have] to weigh all the evidence on both sides and then when it has been concluded make a judgment, either to have the operation or not to have it.

'If you are satisfied to a moral certainty that having weighed and evaluated everything that can be considered on the subject, the course of action you are taking is the right course for you to take. If you have a settled conviction that you are doing the right thing, that is what the law considers to be satisfaction to a moral certainty....' " *Id.* at 912–913.

(c) A reasonable doubt " 'has to be a doubt in your mind that you can stand up in the jury room and argue with principle and integrity to your fellow jurors, and if you have that kind of a doubt on any area in this case, the defendant is entitled to be acquitted.' " *Id.* at 910.

(d) " 'If an unreasonable doubt or a mere possibility of innocence were sufficient to prevent a conviction, practically every criminal would be set free to prey upon the community. Such a rule would be wholly impractical and would break down the forces of law and order and make the lawless supreme.' " *Id.* at 911.

(e) " 'I impress upon you that it [i.e. reasonable doubt] is not beyond the possibility of your being wrong, so don't let that be a haunting thought which bothers you.' " *Id.*

The First Circuit in *Bumpus* did not, of course, endorse any of the five challenged aspects of the reasonable doubt instruction. It merely held that, though problematic, the instructions taken as a whole did not deprive "petitioner of his basic right to be tried and convicted only under the standard of 'proof beyond a reasonable doubt'...." *Id.* at 913.

3

Because the *Bumpus* instruction did not amount to constitutional error, I am compelled as a matter of linguistic analysis to conclude that the five alleged errors in the instant petitioner's instruction must also be viewed not to be of constitutional magnitude.

(a) The equation of "reasonable doubt" with "moral certainty" was not a formulation of sufficient impropriety in *Bumpus* to support a finding of constitutional error.

(b) The charge here that reasonable doubt is absent when the juror is "so fully convinced that he (a juror) would act on his own conviction in matters of the highest

importance concerning his own affairs," uses phraseology virtually identical to that which was tolerated by the court in *Bumpus,* and held to provide "no ground for finding constitutional error." *Bumpus,* 635 F.2d at 912.

(c) The examples of marriage, buying a home, and retirement which were used in the challenged instruction here to illustrate "moral certainty," were arguably "less momentous," *id.* at 913, than the heart operation analogy used in *Bumpus;*[14] consequently, it could be argued that the instant examples trivialized the jurors' duty to a greater degree than did the example in *Bumpus.* However, the examples challenged before me are certainly more momentous than the examples challenged in *Grace v. Butterworth,* 635 F.2d at 3 n. 2[15] and held by the court not to have had "a sufficiently devastating impact on the trial to amount to a denial of due process." *Id.* at 6.

(d) The language in the challenged instruction here that described reasonable doubt as "a doubt for which a *good reason* can be given" is less objectionable than the *Dunn* charge which maintained that the doubt necessary to acquit must be based on "good and sufficient reason." *Dunn,* 570 F.2d at 23. Moreover, it is certainly less objectionable than the language in *Bumpus* which called for the doubt to be such that a juror could argue it with "principle and integrity." *Bumpus,* 635 F.2d at 910. Although the First Circuit in *Bumpus* regarded the "principle and integrity" language as "less objectionable," *id.,* than the "good and sufficient" language in *Dunn,* I am compelled to observe that the *Bumpus* formulation strikes me as the more objectionable. The *Bumpus* language seems to suggest that to acquit a defendant, a juror's doubt must be so strong that no matter how timid he may be he would be willing to stand up and defend it in public. If anything, the *Bumpus* "principle and integrity" language has a greater tendency to shift the burden of proof to the petitioner to establish doubt then does the instant "good reason" formulation. In any event, if the "principle and integrity" instruction did not amount to error of constitutional dimension in *Bumpus, a fortiori,* the present "good reason" language is not constitutional error.

4

Whether dissected and analyzed component by problematic component, or synthesized and analyzed as a whole, the challenged jury instruction on reasonable doubt in this case is on its face more tolerable—as a matter of language—than the instructions tolerated by the First Circuit in *Bumpus. See also Grace v. Butterworth,* 635 F.2d 1. There is nothing in the petitioner's challenged instruction here that approaches the "patently erroneous" definition of reasonable doubt that devastated the charge in *Dunn v. Perrin* and caused the court there to grant the writ.

**14.** The heart operation example discussed in *Bumpus,* however, was more problematic than the examples used in the instant case. As the court in *Bumpus* noted, "The analogy was flawed, as a logical matter, since it presented a case in which either one of two possible choices was fraught with risk and therefore neither choice could be made with anything approaching moral certainty. The jurors may have been baffled by this inconsistency but we see little danger that they were affirmatively misled by what amounted to an extended non sequitur." *Bumpus,* 635 F.2d at 913.

**15.** The instruction at issue in *Grace* included the following:
   "... But unless after weighing all the pros and cons we come to the conclusion that we are morally sure we are doing the right thing, then we don't act.

   "For example, in your own lives at some time or other you may have had to make a decision whether to quit school, to get a job or to go on with your education; or whether to get married or stay single; or whether to stay married or get a divorce; whether to buy a house or continue to rent; or whether to pick up and move to another location and leave your friends for the offer of a better job.

   "Now, whenever you have had to make that type of a decision, you weigh the pros and cons carefully. And unless you are sure to a moral certainty that you are doing the right thing, you don't act. You don't make the change. It is that type of sureness that the law means by the expression 'beyond a reasonable doubt.'"

The ailing instruction in *Dunn* wholly misconceived the role of reasonable doubt on two grounds. By requiring reasonable doubt to be the equivalent of a "strong and abiding conviction as still remains" after evaluation of the evidence, it effectively a) transferred the burden to the defendant and b) set that burden as one of establishing a strong and abiding conviction of doubt. The phrase "strong and abiding conviction" turned the concept of reasonable doubt on its head. It was a misformulation that did not merely obscure the concept; it radically transformed reasonable doubt into its opposite. Such a fundamental misconception would mandate guilty verdicts whenever the defendant failed to demonstrate a strong and abiding conviction of doubt. A conviction founded on that definition of reasonable doubt would be fundamentally repugnant to the due process principles enunciated by the Supreme Court in *In re Winship*.

The *Dunn* charge was properly characterized as an "inescapable violation of *In re Winship*," *id.* at 24. The instruction challenged by petitioner Smith here was, however, a protracted misstatement the consequences of which may escape reversal under controlling caselaw because it did not have "a sufficiently devastating impact on the trial to amount to a denial of due process." *Grace*, 635 F.2d at 6.[16]

### B

The extended discussion of *Dunn* and *Bumpus*, two First Circuit cases on either side of the dividing line between intolerably erroneous and tolerably erroneous reasonable doubt instructions, underscores the difficulty of providing a linguistically tolerable—let alone an acceptable—definition of reasonable doubt. Moreover, the apparent willingness of courts in other jurisdictions to recommend reasonable doubt formula-

tions emphatically rejected by the First Circuit suggests that no ready consensus exists regarding the proper formulation of a reasonable doubt instruction.

The Supreme Court has long been sceptical about the ability to offer a helpful definition of reasonable doubt. In *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954) the Court cited approvingly to the doubts expressed in *Miles v. United States*, 103 U.S. 304, 312, 26 L.Ed. 481 (1880): "Attempts to explain 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." The roughly contemporary case of *Hopt v. Utah*, 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708 (1887) reflected similar doubts with its observation that the reasonable doubt standard "may be, and often is, rendered obscure by attempts at definition, which serve to create doubts instead of removing them." *Id.* at 440–41, 7 S.Ct. at 619.

The First Circuit, itself, has been exceptionally candid when describing the difficulties in providing an acceptable definition. In 1984 the Court of Appeals noted with weary resignation that an argument presented to it "proves once again that any attempt to define 'reasonable doubt' will probably trigger a constitutional challenge.... It can be said beyond any doubt that the words 'reasonable doubt' do not lend themselves to accurate definition." *United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984).

It is undoubtedly this lack of certainty about the proper language with which to define reasonable doubt for jurors which has led to a growing trend among appellate courts to encourage trial judges not to provide any definition at all. Recently the

---

**16.** In reaching this determination, I have read and reread the transcript of the trial several times while this matter was under consideration in order to satisfy myself that evaluation of petitioner's claim not be simply a matter of arid linguistic analysis. There is no question that juror understanding of reasonable doubt was critical to juror decision making in Mr. Smith's

trial. *See generally* Section II.B. *supra.* My review of the record does not disclose any material difference in this regard between Mr. Smith's trial, however, and the trials in *Bumpus* or *Grace*. As a consequence, I am satisfied that comparative evaluation of the language in the charges is sufficient to address petitioner's constitutional claim.

First Circuit joined the Fourth,[17] Seventh,[18] and Ninth,[19] in approving a definition which does not define. *United States v. Olmstead,* 832 F.2d 642, 646 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1739, 100 L.Ed.2d 202 (1988). In *Olmstead,* the Court oxymoronically praised a charge which provided no definition of reasonable doubt as "a model of clarity," and held "that no definition of reasonable doubt need be included in jury instructions." *Id.* at 646.

As a general proposition, the First Circuit has gone to some lengths to "ma[ke] clear that we would rather leave the 'difficult art of instructing the jury on reasonable doubt in the capable hands of the district judge' ..." *United States v. Johnston,* 784 F.2d 416, 425 (1st Cir.1986), cabinned only by avoidance of the specific forms of reasonable doubt instructions as to which it has previously indicated uneasiness. *Olmstead,* 832 F.2d 646.

In *Bumpus,* the First Circuit observed with what was perhaps more hope than prescience that

> [t]he decade of the 1980's will continue to see a heightened awareness of the dangers lurking in some of the hoary, oft-repeated illustrations used up through the 60's and early 70's to breathe life into the reasonable doubt standard. Such awareness may lead to generally stricter requirements as to what is acceptable and may even result in more helpful charges —although the latter is perhaps debatable if judges are driven to seek safety in

eschewing all illustrations and attempts at explanation.

635 F.2d at 913.

The First Circuit in *Olmstead* was finally driven to chart the course to that safe harbor. And, pending further soundings from other quarters, *see, e.g., United States v. Littlefield,* 840 F.2d 143 (1st Cir. 1988), *petition for cert. filed* No. 88–5094 (July 14, 1988), the safe harbor of leaving the concept of reasonable doubt undefined remains open and alluring to the cautious Massachusetts federal trial judge.[20]

### C

The current state of the case law in the First Circuit reflects two basic approaches constructed to deal with the problem of defining reasonable doubt. One approach involves emphatic denunciation but reluctant toleration of various judicial formulations for guidance to juror understanding of the concept of reasonable doubt. The construct resulting from that approach most closely resembles a judicial Tower of Babel.

The other approach involves the countenancing of a judicial determination not to define reasonable doubt at all. The construct resulting from that approach approximates the Sphinx in its resolute and enigmatic refusal to proliferate meaning beyond itself.

It is tempting to treat these different approaches to the explanation of reasonable doubt as simply reflective of differences in perspective regarding the design

---

**17.** *Murphy v. Holland,* 776 F.2d 470, 475 (4th Cir.1985) ("the wisest course for trial courts to take is to avoid defining reasonable doubt in their instructions unless specifically requested to do so by the jury"), *vacated on other grounds,* 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 334 (1986).

**18.** *United States v. Lawson,* 507 F.2d 433, 441–43 (7th Cir.1974) (defining reasonable doubt optional with trial judge), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).

**19.** *United States v. Witt,* 648 F.2d 608, 610–11, (9th Cir.1981) (defining reasonable doubt discretionary with trial judge).

**20.** No such safe harbor is available to the Massachusetts state trial judge, however. The Mas-

sachusetts state Appeals Court has expressly declined to follow *Olmstead. Commonwealth v. Stellberger,* 25 Mass.App.Ct. 148, 515 N.E.2d 1207 (1987). *Stellberger* reversed a conviction for failure to provide a definition of reasonable doubt despite the fact that the defendant failed to object at trial or argue the point adequately on appeal. The Massachusetts Appeals Court effectively imposed a non-waivable mandate to state trial judges to offer the jury a definition of reasonable doubt. Rejecting *Olmstead,* the *Stellberger* court held that "the necessity for a proper instruction on the meaning of reasonable doubt is a matter of State law which, in this area, requires more than the First Circuit does." *Id.* at 150, 515 N.E.2d 1207.

of instructions to guide juror understanding. Candor, however, compels the conclusion that these various approaches are reflective of a more fundamental issue. There appears to be no accepted linguistic definition of reasonable doubt because there appears to be no settled understanding about what reasonable doubt entails.

To be sure, there is a settled understanding that no procedural safeguard is more important than the one embodied in the reasonable doubt standard. The reasonable doubt standard represents our society's effort to instruct jurors that they should have a high degree of confidence before they deny a person his liberty. The standard

is a prime instrument for reducing the risk of convictions resting on factual error.

. . . . .

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned.

*In re Winship*, 397 U.S. at 363–364, 90 S.Ct. at 1072–1073.

But the content of the reasonable doubt standard is as imprecise as it is important. Wigmore put the matter with blunt accuracy:

the truth is that no one has yet invented or discovered a mode of measurement for the intensity of human belief. Hence there can be yet no successful method of communicating intelligibly to a jury a sound method of self-analysis for one's belief. If the truth be appreciated, courts will cease to treat any particular form of words as necessary or decisive in the law for that purpose; for the law cannot expect to do what logic and psychology have not yet done.

9 Wigmore, Evidence § 2497 at 414–415 (Chadbourne rev. 1981).

The vagaries of the measurement of doubt are graphically illustrated when an effort is made to render them with mathematical precision. In studies reported in Underwood, *The Thumb on the Scales of Justice; Burdens of Persuasion in Criminal Cases,* 86 Yale L.J. 1299 (1977), judges, students and jurors were asked to quantify the probability standard they associated with the concept of beyond a reasonable doubt. "[A]lmost a third of the responding judges put 'beyond a reasonable doubt' at 100%, another third put it at 90% or 95%, and most of the rest put it at 80% or 85%.... Questionnaires sent to jurors and students produced slightly lower results...." *Id.* at 1311.

In a survey conducted by Judge Weinstein among his colleagues on the bench of the United States District Court for the Eastern District of New York, the assessments of probabilities produced by the ten judges surveyed ranged from 76% to 95%. *United States v. Fatico,* 458 F.Supp. 388, 410 (E.D.N.Y.1978) (Weinstein, J.), *aff'd,* 603 F.2d 1053 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980).[21]

Based on the results reported in the Underwood article and his survey, Judge Weinstein concluded,

[t]his wide variation confirms the wisdom of Maimonides, who justified the high probability requirement in criminal cases partly on the ground that some triers would tend to shave the barriers to a finding of guilt. He wrote:

---

21. The different—and similarly various—efforts to quantify the degree of error which the criminal law will accept are catalogued by Professor Williams in his discussion of English criminal trial procedure. G. Williams, The Proof of Guilt—A Study of the English Criminal Trial 186–190 (3d ed. 1963). Beginning with the Roman maxim "that it is better for a guilty man to go unpunished than for an innocent one to be condemned" followed by Fortescues' "sentiment that twenty guilty men should escape death through mercy rather than one just man be unjustly condemned," Professor Williams charts the expressions of tolerable ratios through Blackstone, who "reverted to ten to one," noting that "in that form it became established." *Id.* at 187.

The 290th commandment is the prohibition to carry out punishment on a high probability, even close to certainty.... Do not think this law unjust. For among contingent things some are very likely, other possibilities are very remote, and yet others are intermediate. The 'possible' is very wide. Had the Torah permitted punishment to be carried out when the possibility is very likely—such that it is almost a necessity ... *some might inflict punishment when the chances are somewhat more distant than that, and then when they are even further still, until they would punish and execute people unjustly on slight probability according to the judge's imagination....* If we do not punish on very strong probabilities, nothing can happen other than that a sinner be freed; but if punishment be done on probability and opinion it is possible that one day we might kill an innocent man— and it is better and more desirable to free a thousand sinners, than ever to kill one innocent.

Maimonides, Safer HaMitzvot, Negative Commandment 290, quoted in N.L. Rabinovich, Probability and Statistical Inference in Ancient and Medieval Jewish Literature, 111 (1973).

*Fatico*, 458 F.Supp. at 410–411 (emphasis supplied by Judge Weinstein).

### D

In the absence of a consensus regarding what reasonable doubt entails, perhaps it is better simply to leave it to the jury as the collective conscience of the community [22]—uninstructed by awkward and conflicting judicial reformulations and explications—to decide for itself what reasonable doubt should mean in a given dispute. Certainly the course of recent case law suggests, as Justice Field warned over 100 years ago in *Hopt*, 120 U.S. at 440–41, 7

S.Ct. at 618–19, that efforts at redefinition of the standard may serve to create problems rather than remove them.

Leaving the concept of reasonable doubt undefined may also be the most efficient choice for purposes of judicial administration. Wigmore offers the practical, if acerbic, view that:

... when anything more than a simple caution and a brief definition is given, the matter tends to become one of mere words, and the actual effect upon the jury, instead of being enlightenment, is likely to be rather confusion or, at the least, a continued incomprehension. In practice, these detailed amplifications on the doctrine have usually degenerated into a mere tool for counsel who desire to entrap an unwary judge into forgetfulness of some obscure precedent, or to save a cause for a new trial by quibbling, on appeal, over the verbal propriety of a form of words uttered or declined to be uttered by the judge. The effort to perpetuate and develop these elaborate unserviceable definitions is a useless one and serves today chiefly to aid the purposes of the tactician.

9 Wigmore, Evidence § 2497 at 408–09 (Chadbourne rev. 1981).

In this connection cases such as *Olmstead* appear to be an effort to save the time of courts and counsel by making clear that if the trial judge chooses not to attempt to add to the understanding of the concept of reasonable doubt, that judge will not be viewed on appeal as subtracting from it.

In this otherwise unsettled area, *Olmstead* also effectively establishes as a basic philosophical precept that the concept of reasonable doubt has an *a priori* existence in the minds of all jurors. This original juror understanding of reasonable doubt is apparently considered under the case law constitutionally sufficient to resist most infectious errors communicated by misformu-

---

**22.** Professor Nesson argues forcefully that efforts to quantify reasonable doubt should be avoided because the result would be to invade the role of the jury as the community's collective body for producing "authoritative finality" in fact finding. Nesson, *Reasonable Doubt and Permissive Inferences: The Value of Complexity*,

92 Harv.L.Rev. 1187, 1192–99 (1979). Given this institutional role, "[r]easonable doubt defies exact definition precisely because it is a concept meant to encompass many different, individual views of how probable guilt must be (or how unlikely innocence must be) to warrant conviction." *Id.* at 1197.

lated charges. Jurors are presumed capable of surviving exposure to dilutions or trivializations of the concept of reasonable doubt offered by well-intentioned judges engaged in a misguided effort to enhance understanding of the concept. It is only when a misformulation so distorts the concept as to make it something it clearly is not—as in *Dunn* and *Lanigan*—that the charge will be found to suffer from deficiencies of a constitutional magnitude.

## V

The dispositive question for a United States District Judge sitting to consider a state habeas corpus petition challenging an instructional error is not merely whether the state court instruction may be viewed as having in some sense subtracted from the sum of understanding regarding the concept of reasonable doubt. Rather the question is whether so much has in fact been taken from the definition of reasonable doubt that the concept has lost its critical constitutional mass.

Under controlling case law in this Circuit, the instruction at issue here did not create too great a deficit in the jurors' untutored understanding of the concept of reasonable doubt.

Accordingly, the writ will be DENIED and the Clerk is instructed to dismiss the petition.