UNITED STATES of America, Appellee,

v.

George OLMSTEAD,
Defendant, Appellant.

No. 86–1773.

United States Court of Appeals,
First Circuit.

Argued Sept. 18, 1987.

Decided Oct. 29, 1987.

James B. Krasnoo, by Appointment of the Court, with whom Norris, Kozodoy, Krasnoo & Fong, Boston, Mass., was on brief, for defendant, appellant.

Richard G. Stearns, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES and BREYER, Circuit Judges, and LAGUEUX,* District Judge.

* Of the District of Rhode Island, sitting by designation.

BOWNES, Circuit Judge.

Defendant-appellant George Olmstead was convicted by a jury along with codefendants Herbert Raymond and Waltham Screw Company for conspiring to submit false claims to the United States Government and for submitting, or aiding or abetting the submission of, fraudulent claims in violation of 18 U.S.C. §§ 2, 286, 287. Olmstead assigns four errors on appeal: that the trial court's decision to exclude any definition of reasonable doubt from the instructions to the jury deprived him of due process of law; that the absence of an instruction cautioning the jury to view accomplice testimony with great scrutiny was error and impermissibly undermined a defense theory; that the questioning of a government witness by the trial judge exceeded acceptable bounds and constituted an abuse of discretion; and that the delayed disclosure of exculpatory evidence by the government deprived him of a fair trial. We find each of these contentions without merit and affirm the judgment below.

## I. BACKGROUND

This case concerns an alleged conspiracy to defraud the United States by falsely submitting claims for payment for products which failed to meet minimum government standards. The conspiracy involved the Waltham Screw Company of Keene, New Hampshire, George Olmstead, the plant manager, and Herbert Raymond, the production manager. In 1981, Waltham Screw Company entered into a government contract with the Department of Defense to manufacture flash suppressors for the M–16 rifle. A flash suppressor, as its name indicates, reduces the visible flash produced when the rifle is fired. The contract called for Waltham Screw Company to provide approximately 30,800 suppressors in twenty-seven separate shipment lots.

Before the government accepts any shipment, a quality assurance representative (QAR) must inspect a representative sample of the product and sign an inspection form (DD form 250) which thenceforth serves as an invoice. Defendants allegedly conspired to defraud the government by rigging samples of flash suppressors to pass inspection. Such conduct dates to January 2, 1985, when Michael Carbone, the QAR, arrived to examine a shipment of suppressors manufactured by Waltham Screw Company. The same lot had been inspected previously and rejected by Carbone because he had detected numerous defective units.

Prior to Carbone's arrival for the reinspection, Olmstead ordered Robert Lenox, the internal quality control representative for the firm, to remove the defective suppressors from the lot and to set them aside. Lenox was told to tell Carbone that he had detected and removed fifteen defective suppressors and made up the difference with satisfactory ones. Olmstead, Lenox, and Raymond were present during Carbone's inspection. Lenox assured Carbone that the lot contained the requisite 670 items while, in fact, it was short more than 100 suppressors. After Carbone approved the shipment, Raymond put the defective suppressors back into the lot to remedy the deficiency.

Lenox decided to tell Carbone what had transpired. Prior to Carbone's arrival, he had attempted to mark the defective suppressors with ink. Carbone testified that Lenox approached him in the men's room at the Company on January 2, 1985, and that the two men then met at Carbone's office on the third of January to discuss the situation. Lenox acceded to Carbone's request, and subsequently that of Special Agent Kolben of the Defense Criminal Investigation Service, to aid in an investigation of the Waltham Screw Company's conduct.

The next two shipments due under the contract were scheduled for inspection on March 1, 1985. The conspirators prepared for this event both by preselecting satisfactory suppressors to be presented to the QAR and by increasing the number of defective ones in the actual shipments. Olmstead directed Lenox to sift through the flash suppressors and to set aside 200 acceptable units which were to be given to Carbone for inspection as a random sample that accurately reflected the quality of the

entire lot. Defendant then ordered Lenox to increase the number of defective items in the shipments by taking discarded suppressors from the junk bin and putting them among those to be shipped. Olmstead also instructed Lenox and Raymond to stack the entire lot of suppressors behind machinery so as to conceal it from view by Carbone and thus avoid the risk of inspection of the doctored lot.

Before starting work on March 1, Lenox met with Carbone and Kolben. The latter fitted Lenox with a recording device. Lenox explained the rigged sample to Carbone who agreed not to insist upon selecting his own sample for inspection. Lenox then proceeded to work where the final preparations for the inspection took place.

During the inspection, Olmstead assured Carbone that the sample prepared for his convenience fairly represented the larger lot. Carbone then approved both shipments, and signed the DD form 250 which Waltham Screw Company submitted for payment. Before shipping out the approved suppressors, Olmstead ordered Lenox to remove the rigged sample and put it in his office for subsequent use.

The two final inspections were preceded by similar conduct on the part of defendants. Because the company had manufactured too few flash suppressors to meet the quantity requirements of the contract, Olmstead ordered Lenox to set aside numerous suppressors from the junk bin and informed him that, after Carbone approved the next to last shipment, these defective suppressors would be shipped in place of the approved ones. Olmstead would thus be able to reserve the satisfactory suppressors for the final inspection and obtain Carbone's (re)approval of the last shipment.

On November 22, 1985, the Grand Jury returned an indictment against Waltham Screw Company, Olmstead, and Raymond. Count I charged defendants with conspiracy to defraud the United States. 18 U.S.C. § 286. Counts II–IV charged defendants with the substantive offense of submitting, or aiding and abetting the submission of, false and fraudulent claims. 18 U.S.C. §§ 2, 287. After a ten-day trial, the jury returned a verdict against Olmstead on all four counts. Olmstead's appeal is the only one before us.

## II. THE REASONABLE DOUBT INSTRUCTION

The district court instructed the jury three times, twice at the start of the case and once in the final charge, essentially as follows:

> Mr. Olmstead, Mr. Raymond, Waltham Screw are presumed to be innocent of all charges. And what that means in the law is that they cannot be found guilty of anything unless and until the government proves that one or more of them is guilty and proves it beyond a reasonable doubt. It means that this burden of proving, this burden of coming up with evidence and persuading you beyond a reasonable doubt rests entirely on the government. It never shifts. Mr. Olmstead, Mr. Raymond, Waltham Screw, they don't have to explain anything. They don't have to call any witnesses. They don't have to testify themselves. Their lawyers don't have to ask a single question. They don't have to make any statements to you. Under the law they need do nothing. And you then judge whether what the United States has presented before you convinces you beyond a reasonable doubt.

Defendant argues that the absence of a definition or explanation of "reasonable doubt" deprived him of constitutional rights and warrants reversal because the instruction did not adequately apprise the jury of the appropriate standard for conviction. We disagree.

Defendant bases his argument on the importance of the reasonable doubt standard in the criminal law system. The Supreme Court has held that the Due Process Clause requires proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

> The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions

resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law."

*Id.* at 363, 90 S.Ct. at 1072 (quoting *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895)). This court has acknowledged the centrality of the reasonable doubt charge: "Discussion of the concept is perhaps the most important aspect of the closing instruction to the jury in a criminal trial." *Dunn v. Perrin,* 570 F.2d 21, 25 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978).

Despite the importance of the reasonable doubt standard in safeguarding the rights of criminal defendants, the term has eluded clear definition. Judges and jurors repeatedly witness the truth of the Supreme Court's statement that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Miles v. United States,* 103 U.S. (13 Otto 304) 304, 312, 26 L.Ed. 481 (1880). *Accord United States v. Gibson,* 726 F.2d 869, 874 (1st Cir.) ("It can be said beyond any doubt that the words 'reasonable doubt' do not lend themselves to accurate definition."), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984).

Most efforts at clarification result in further obfuscation of the concept. Many definitions reduce the burden of proof on the government by expanding the degree of doubt permissible, *United States v. MacDonald,* 455 F.2d 1259, 1263 (1st Cir.), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2073, 32 L.Ed.2d 350 (1972), and consequently such definitions result in increased appellate litigation. *Id.; United States v. Gibson,* 726 F.2d at 874 ("[A]ny attempt to define 'reasonable doubt' will probably trigger a constitutional challenge.") (citing *United States v. Drake,* 673 F.2d 15, 20–21 (1st Cir.1982)).

Recently several circuits have recognized the futility of defining the words "reason-able doubt" and have discouraged further attempts at definition. The Fourth Circuit in *Murphy v. Holland,* 776 F.2d 470 (4th Cir.1985), *vacated on other grounds,* 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 334 (1986), summarized the reasons behind its disapproval of efforts to define reasonable doubt at trial.

The term reasonable doubt itself has a self-evident meaning comprehensible to the lay juror. That subjective meaning is hardly susceptible to significant improvement by judicial efforts to define reasonable doubt with unattainable precision. Instead of improvement, the most likely outcome of attempts to define reasonable doubt is unnecessary confusion and a constitutionally impermissible lessening of the required standard of proof.... To protect the accused's due process rights and avoid supplying the grounds for unnecessary constitutional challenges ... the wisest course for trial courts to take is to avoid defining reasonable doubt in their instructions unless specifically requested to do so by the jury.

*Id.* at 475 (citing *United States v. Gibson,* 726 F.2d at 874); *accord United States v. Moss,* 756 F.2d 329, 333 (4th Cir.1985). Other circuits have endorsed the same approach. *See, e.g., United States v. Lawson,* 507 F.2d 433, 441–43 (7th Cir.1974) (announcing rule that definition of reasonable doubt should be at option of trial judge), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); *United States v. Martin-Trigona,* 684 F.2d 485, 493–94 (7th Cir.1982); *United States v. Regilio,* 669 F.2d 1169, 1177–78 (7th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982); *United States v. Allen,* 596 F.2d 227, 229–30 (7th Cir.1979); *United States v. Witt,* 648 F.2d 608, 610–11 (9th Cir.1981) ("Although a proper definition is always appropriate, the decision whether to define reasonable doubt should be left to the court's discretion.") (footnote omitted); *Whiteside v. Parke,* 705 F.2d 869 (6th Cir.) (failure to give definition of reasonable doubt not error when viewed under totality of the circumstances test), *cert.*

*denied,* 464 U.S. 843, 104 S.Ct. 141, 78 L.Ed.2d 133 (1983).

We have held that an instruction to the jury will survive a constitutional challenge if it " 'adequately apprise[s] the jury of the reasonable doubt standard.' " *United States v. Johnston,* 784 F.2d 416, 426 (1st Cir.1986) (quoting *United States v. Drake,* 673 F.2d at 21). In light of the common meaning which the words "reasonable doubt" import, we hold that an instruction which uses the words reasonable doubt without further definition adequately apprises the jury of the proper burden of proof. This does not mean, of course, that the phrase can be buried as an aside in the opinion.

The final instruction in the case at bar informed the jury in clear and understandable words of the meaning of the presumption of innocence and reasonable doubt. This is not a case where the trial judge made only passing reference to the reasonable doubt standard, thus impermissibly lessening the government's burden of proof. The instruction, which we applaud as a model of clarity, stated:

> Remember that great principle, and it is a great principle of our Constitution in the criminal law, that Mr. Olmstead and Mr. Raymond and Waltham Screw started this case presumed to be innocent. And no one of them can be found guilty unless and until you determine that they are guilty beyond a reasonable doubt based upon the evidence. And that means that the burden of proving them guilty, or any one of them guilty, beyond a reasonable doubt, rests on the United States, and it never shifts. They don't have anything to explain. They don't have to testify. They don't have to have called any witnesses or made any arguments or asked any questions. And you may not, you would violate your oath if you held against anyone something that they didn't do. Because the law doesn't require them to do anything. That's unfair. The law says to the United States: You've made this charge, prove it beyond a reasonable doubt.

■ In stating that a charge like this one is strong and clear—a belief we have formed after reviewing on appeal numerous formulations of the reasonable doubt charge—we do not intend to impose a straightjacket upon district court judges. This court has recognized the central role of the trial court in instructing the jury, *cf. Cupp v. Naughten,* 414 U.S. 141, 149, 94 S.Ct. 396, 401, 38 L.Ed.2d 268 (1973), and has left to the trial judge "the choice among acceptable linguistic alternatives." *Tsoumas v. State of New Hampshire,* 611 F.2d 412, 414 (1st Cir.1980); *accord Bumpus v. Gunter,* 635 F.2d 907, 910 (1st Cir. 1980) ("Unless this Court is to end up imposing pattern jury instructions, we must tolerate a reasonable range of expression, some or even much of which may not suit our fancy."), *cert. denied,* 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207 (1981). While we hold that no definition of reasonable doubt need be included in jury instructions, and while we repeat our past admonitions that attempts at definition should not stray far from "the consistently approved stock of charges on reasonable doubt," *United States v. MacDonald,* 455 F.2d at 1263, we leave to the discretion of the trial judge whether there should be further explanation of the term.

### III. THE QUESTION OF ACCOMPLICE TESTIMONY

■ Defendant next claims error in the refusal of the trial judge to instruct the jury to scrutinize accomplice testimony with great care. Defendant argues that Lenox willfully participated in the underlying venture, and that, since the jury could have determined the government informant to be an accomplice, the standard instruction on accomplice testimony was mandatory. The absence of such an instruction, defendant further contends, deprived him of an important defense theory.

Defendant claims that prior to the meeting between Lenox and Carbone on January 3, 1985, Lenox willfully participated in the attempt to defraud the government. While defendant concedes that the informant's decision to cooperate with the government abruptly ended any question

of his involvement in the conspiracy, defendant maintains that the decision merely terminated rather than negated Lenox's status as an accomplice.

The government correctly notes, however, that an accomplice must share in the criminal intent of the principals. *United States v. Tarr*, 589 F.2d 55, 59 (1st Cir. 1978). Construing the evidence in the light most favorable to the government, *id.* at 57, we find that Lenox lacked such intent. Not only did Lenox approach Carbone on the day of the January 2 inspection to arrange a meeting, but he also attempted to mark the defective flash suppressors with ink prior to Carbone's arrival. Such conduct does not evince an intent to further the criminal venture. "There is no evidence which would support a sufficient inference that [defendant] consciously associated [himself] with the ... venture or participated in it as something which [he] sought to bring about or that [he] sought by [his] action to make the venture successful." *United States v. Francomano*, 554 F.2d 483, 487 (1st Cir.1977).

■ Furthermore, even if the jury could have determined that Lenox aided and abetted the conspiracy, the absence of an accomplice instruction does not constitute reversible error. This court has held that while a cautionary instruction is advisable, its absence does not require reversal automatically. In *United States v. Wright*, 573 F.2d 681 (1st Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978), we considered defendant's argument that the absence of an instruction cautioning the jury to scrutinize carefully the testimony of the principal witness mandated reversal. The defendant had been convicted of transporting or causing to be transported a woman in interstate commerce for the purpose of prostitution, largely on the basis of the testimony of the woman allegedly transported. We held that the absence of an accomplice instruction was harmless.

First, we doubt that the witness was an accomplice.... But, in any case, we have

held that the uncorroborated evidence of an accomplice will convict the defendant. *United States v. Miceli*, 446 F.2d 256, 258 (1st Cir.1971). Though it is prudent for the court to give a cautionary instruction ... failure to do so is not automatic error especially where the testimony is not incredible or otherwise insubstantial on its face. *United States v. House*, 471 F.2d 886, 888 (1st Cir.1973). The principal witness's testimony in this case was "generally consistent and credible." *Id.* Moreover, aspects of the testimony were corroborated by documentary evidence and the tapes.

*Id.* at 685.

The case at bar is covered by the above holding. Not only did Lenox present consistent and credible testimony, but his account of the activities was substantiated by the tapes. These tapes, in tandem with the testimony of other witnesses, revealed both defendant's orchestration of the conspiracy and his disregard for the consequences of his actions.[1] *See United States v. Skandier*, 758 F.2d 43, 46 (1st Cir.1985) ("The [accomplice] instruction should have been given, tied to the jury's resolution of that question.... However, we will not reverse for this failure in light of the abundant tangible evidence confirming the witness's account of defendant's guilt.") (citations omitted). Clearly, the decision of the district court to omit an instruction regarding accomplice testimony was not reversible error, if it was error at all.

Defendant further contends that the failure to caution the jury about accomplice testimony impermissibly undercut an important defense theory. In his closing argument, defendant painted a picture of Lenox as a duplicitous self-serving climber who both initiated and uncovered the fraud to better his chances for government employment. While it is true that a trial court must instruct the jury on a defense theory which is sufficiently supported by both the evidence and the law, *United States v. Sommerstedt*, 752 F.2d 1494,

1. Carbone testified that during an encounter with Olmstead, the latter commented: "Why are you so concerned about the flash suppressors? It's only a piece of steel. It goes on the end of a barrel. If the soldier gets shot, someone else picks up his gun and goes on and does his duty."

1496 (9th Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 149, 88 L.Ed.2d 123 (1985), the judge is not bound to give the exact instructions proposed. *United States v. Morris,* 700 F.2d 427, 433 (1st Cir.) ("The refusal to give a particular instruction is unobjectionable if the charge given adequately covers the theory of defense.... The court need not give instructions in the form and language requested by the defendant.") (citations omitted), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *United States v. Dyer,* 821 F.2d 35, 38–39 (1st Cir.1987) (same). In the instant case, the court's general instructions on witness credibility alerted the jury to the potential for conflicting motivations behind specific testimony.[2] The court cautioned the jury to consider not only witness credibility but also the existence of corroboration. The instructions given adequately covered defendant's theory of defense and offered no grounds for reversal. *Cf. United States v. Pitocchelli,* 830 F.2d 401, 404 (1st Cir.1987) (no error to omit instruction on accomplice testimony where court gave jury instruction on how to evaluate a witness's credibility).

## IV. QUESTIONING BY THE COURT

Defendant further claims reversible error on the grounds of improper judicial intrusion into the trial process. He argues that the court wrongly directed questions to Lenox throughout the government's direct examination of the witness and there-

by abandoned its neutrality and assumed the role of a prosecutor. Defendant urges that the court's unique treatment of Lenox as a witness highlighted the latter's testimony and conveyed to the jury an appearance of partiality. We have examined each instance of alleged misconduct claimed by defendant and find the charge meritless. The comments and questions interjected by the court served to remedy leading questions, clarify lines of inquiry or develop the witness's answer. Such conduct is well within the court's discretion. We have held consistently that "[t]he court has considerable discretion to interrupt and ask impartial questions 'in order to clarify misunderstandings or otherwise insure that the trial proceeds efficiently and fairly.'" *United States v. Wright,* 573 F.2d at 684 (citing *United States v. McGovern,* 499 F.2d 1140, 1144 (1st Cir.1974)); *accord United States v. Doran,* 483 F.2d 369, 374–75 (1st Cir. 1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974). Moreover, in this instance, the court gave clear instructions to the jury disavowing any judicial bias.[3] *See United States v. Doran,* 483 F.2d at 375. The court here properly exercised its discretion to ensure an efficient and fair trial.

## V. DELAYED DISCLOSURE OF EVIDENCE

Finally, defendant argues that the delayed disclosure by the government of ex-

---

2. The jury instructions specifically stated:
    You may consider the ability of the witness to remember, to comprehend and understand those things about which the witness has testified. You may consider the interest, if any, that the witness may have in the outcome of the case; whether the witness has displayed any friendship or hostility to anyone involved in the case; whether the witness has any motive for falsifying; whether the witness's testimony is backed up, the lawyers say corroborated, but we mean backed up by other testimony or evidence in the case, or whether other evidence in the case detracts from the testimony, takes away from it; whether the witness's testimony has the ring of truth to you people as common sense men and women. Is it plausible? Does it make sense? In short, as reasonable jurors, you may sum up a witness's testimony to determine whether you believe it, disbelieve it, or believe parts of it.

3. The court instructed the jury:
    [I]f you think that I think anything at all about this case, anything at all, I most earnestly tell you to disregard it. And I tell you candidly, I really have no thoughts at all about how this case will come out. None. I do not discuss it with any of the people with whom I'm privileged to work. We're not back there wondering what you are going to do or laying odds on it. That's not appropriate. We don't do it at all, out of the fear that somehow then having expressed an opinion I might I have some view. I have no view.... But if you think somehow that I've got some view, I tell you to disregard it and I don't know what more I can do than earnestly tell you I have no view at all. I wait for your verdict like everyone else in the courtroom, believing that it will be just.

culpatory evidence denied him a fair trial. The evidence at issue is a memorandum written by Special Agent Kolben in which he states that Carbone had notified defendants that all shipments were subject to reinspection at the packaging location. The memorandum was not disclosed to defense counsel until well into the trial. Olmstead claims that pretrial disclosure, in accord with the magistrate's discovery order, would have resulted in a different strategy.

We first note that we deal here with delayed disclosure rather than with total suppression. In such cases, reversal will be granted only where defendants were denied an opportunity to use the evidence effectively. *United States v. Johnston,* 784 F.2d at 425; *United States v. Drougas,* 748 F.2d 8, 23 (1st Cir.1984); *United States v. Peters,* 732 F.2d 1004, 1009 (1st Cir. 1984). In *United States v. Hemmer,* 729 F.2d 10 (1st Cir.), *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984), we applied a two-prong inquiry to determine when prejudice resulted: whether the actual disclosure altered the subsequent defense strategy, and whether, given timely disclosure, a different defense strategy would have resulted. *Id.* at 13. Applying this test to the facts here results in a negative answer to both queries. Defense counsel enjoyed a full day after disclosure to reconsider their strategy in light of the new evidence, *cf. United States v. Peters,* 732 F.2d at 1009 (considering preparation time as factor in equation of prejudice), but made limited use of this evidence in either the cross-examination of Carbone or in final argument. Furthermore, it remains unclear how early disclosure of the memorandum would have altered the defense strategy. The tapes not only disclose Olmstead directing others to rig samples and conceal defective pieces, but also reveal that he discounted any possibility of detection at the packaging plant.[4] In light of this evidence, we find that the delayed disclosure did not deny defendants an opportunity to use Kolben's memorandum effectively.

For the reasons discussed, *the judgment of the district court is affirmed.*

---

4. In response to a concern that the junk pieces might be detected at the packaging stage, Olmstead stated: "The girl, the girl that's packagin 'em, she's just, she's settin' there goin' like this puttin' 'em in a package and it's, in these ___ packages. I don't think something like that, I ___. (Pause) It'll get through."