66 F.3d 306
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
Jaime CATANO, Defendant--Appellant.
UNITED STATES, Appellee,
v.
MICHAEL MURRAY, Defendant--Appellant.
UNITED STATES, Appellee,
v.
Leonel CATANO, Defendant--Appellant.
UNITED STATES, Appellee,
v.
James MURRAY, Defendant--Appellant.
 Nos. 94-1502, 94-1505, 94-1503, 94-1504.
 United States Court of Appeals, First Circuit.
 Sept. 18, 1995.
 
 Appeals from the United States District Court for the District of Massachusetts. [HON. WILLIAM G. YOUNG, U.S. DISTRICT JUDGE]
 D.Mass.
 AFFIRMED.
 William A. Brown, by Appointment of the Court, for appellant Jaime Catano.
 Daniel J. O'Connell III for appellant Michael Murray.
 Robert L. Sheketoff, with whom Sheketoff & Homan was on brief for appellant Leonel Catano.
 Steven J. Brooks, with whom James P. Duggan, by Appointment of the Court, was on brief for appellant James Murray.
 George W. Vien, Assistant United States, with whom Donald K. Stern, United States Attorney, and Geoffrey E. Hobert, Assistant United States Attorney, were on brief for appellee.
 Before STAHL, Circuit Judge, CAMPBELL, Senior Circuit Judge, and JOHN R. GIBSON,* Senior Circuit Judge.
 JOHN R. GIBSON, Senior Circuit Judge.
 
 
 1
 This unpublished portion of our opinion disposes of those issues which do not have sufficient precedential value to warrant publication. Therefore, we incorporate by reference the statement of the case and facts from the published portion of our opinion of the same date. We here discuss and affirm the rulings of the district court in: (1) denying James Murray's suppression motion; (2) denying Jaime Catano's motion for severance; (3) denying Jaime Catano's motion to participate in Michael Murray's omnibus motion hearing; (4) managing the use of peremptory challenges; (5) refusing to define reasonable doubt; (6) convicting Jaime Catano of continuing criminal enterprise; and (7) refusing to adjust Michael Murray's sentence for acceptance of responsibility or to depart downward.
 
 I. JAMES MURRAY'S SUPPRESSION MOTION
 
 2
 James Murray argues that the district court erred in denying his motion to suppress evidence police seized in warrantless searches of James Murray's pickup truck and a Buick James Murray had rented. When the agents arrested James Murray on November 6, 1991, they seized keys to the rented Buick and to the pickup truck. The Buick was parked at the hotel where they had arrested James Murray. The pickup was in a parking lot of the Dallas-Ft. Worth airport. The agents had both vehicles searched. In the Buick, they found a rental agreement in James Murray's name, $2,350 in cash, a Smith Corona typewriter and twelve telephone books from the Southeastern United States.[1] In the pickup, they found $100,000 cash behind the seat. After an evidentiary hearing, the district court denied James Murray's motion to suppress the evidence seized from the Buick and the pickup.
 
 
 3
 James Murray argues that the government had to establish both probable cause and exigent circumstances to justify the warrantless search of these vehicles, but in this he is mistaken. Under the automobile exception to the search warrant requirement, if a motor vehicle is in transit or parked in a public place, police may search it without a warrant, relying solely on probable cause. United States v. McCoy, 977 F.2d 706, 710 (1st Cir.1992); United States v. Panitz, 907 F.2d 1267, 1271-72 (1st Cir.1990).
 
 
 4
 James Murray argues that there was not even probable cause, because the agents' suspicions were based on the word of Roberto Lopez, whom the agents knew to be unreliable.
 
 
 5
 The agents had "probable cause" for the searches if they had facts to support a "well-founded conclusion 'that an offense has been committed and ... sound reason to believe that a particular search will turn up evidence of it.' " Panitz, 907 F.2d at 1271 (internal quotation marks and citation omitted). We review a district court's finding of probable cause on a suppression motion for clear error. United States v. Zapata, 18 F.3d 971, 975 (1st Cir.1994).
 
 
 6
 Contrary to James Murray's contention, the government's probable cause does not depend on the word of Lopez, but on taped conversations among the conspirators and observations of the conspirators' actions after the conversations. From the audio tape supplied by Nigro, the government knew Michael Murray was expecting to obtain marijuana from "Mexicans," that the conspirators were going to Texas for that purpose, and that they would have money to finance the purchase and transportation costs. Shortly before Leonel Catano and Lopez left in the tractor-trailer for Texas, the DEA overheard their conversation with the Murrays, in which they coordinated their respective duties for the upcoming trip.
 
 
 7
 By the time they searched James Murray's vehicles, the DEA agents had seen the conspirators take a number of steps in accordance with the plans laid out in this video taped conversation. In the tape, the group agreed to go to the "crane," and they later went to a crane yard, where they put a steel tank on their trailer. (There was evidence that the group had used that tank before to transport marijuana.) In the tape Michael Murray said that he would get money and Leonel should go to a truck stop; later that day, aerial surveillance agents saw a parked sedan (such as Michael Murray was driving) next to Leonel's truck in the truck area of a highway rest stop. The car and truck left the rest stop at the same time. In the video tape Michael Murray said that James Murray would "go and he's going to have money to pay the other transportation people up in Dallas;" three days later, James Murray showed up in McAllen, Texas in a car rented at the Dallas-Fort Worth airport. In the taped conversation Michael Murray had instructed Lopez and Leonel Catano to "go to Dallas, drop the box then just come, ah, bobtail." Leonel Catano and Lopez did in fact drop the trailer off in Luling and "bobtail" to McAllen.
 
 
 8
 From the taped conversation and subsequent actions of the parties to that conversation, the government had probable cause to believe that James Murray was involved in a scheme to buy marijuana in south Texas and transport it north, and that he would be carrying a significant amount of money to pay for the transportation costs. His rental car and his truck were logical places to look for the money. The district court did not err in finding probable cause, or in denying James Murray's motion to suppress.
 
 II. JAIME CATANO'S MOTION FOR SEVERANCE
 
 9
 Jaime Catano argues that the district court erred in denying his motion to sever. Jaime Catano's argument for severance is lumped together with his argument for participation in Michael Murray's omnibus hearing and reads, in its entirety:
 
 
 10
 [I]t was error for the District Court to deny Jaime Catano's Motion to Sever. Michael Murray had cooperated extensively with the government. There was no way Jaime Catano's counsel could know that, in a joint trial, the source of the government's evidence against him was co-defendant Michael Murray. See Bruton v. U.S., 391 U.S. 123 (1968).
 
 
 11
 Denial of a motion for severance is "committed to the sound discretion of the trial court, and we review only for a manifest abuse of discretion resulting in a miscarriage of justice." United States v. Welch, 15 F.3d 1202, 1210 (1st Cir.1993), cert. denied, 114 S.Ct. 1661 (1994). To obtain severance, a defendant must show that " 'substantial prejudice' would result from a joint trial." Id. (citation omitted). Prejudice in this context requires "more than just a better chance of acquittal at a separate trial." United States v. Martinez, 479 F.2d 824, 828 (1st Cir.1973). Jaime Catano has shown no substantial prejudice. Further, his reliance on Bruton is misplaced. Bruton prevents the admission at a joint trial of one co-defendant's extrajudicial statements implicating another absent the opportunity for cross-examination, 391 U.S. at 135-36, a situation not presented here. Jaime Catano's three-sentence argument leaves the issue undeveloped and, therefore, waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990).
 
 III. JAIME CATANO'S MOTION TO PARTICIPATE
 
 12
 Jaime Catano sought to participate in Michael Murray's omnibus hearing described in Part I of our published opinion. Jaime Catano contended that Michael Murray's bargain with the government would benefit Jaime Catano as well. He argues that his participation would have allowed him to cross-examine witnesses as to the benefit which he would receive from his own and from Michael Murray's cooperation with the government. He further argues that he could have "threshed out" discussions between himself and the DEA and "gleaned" any information the government learned about him from Michael Murray. At the motion hearing, Jaime Catano's counsel orally moved the court to intervene and examine witnesses. The district judge ruled, "I'm not going to let you examine, but on the other hand, you file a motion supported by an affidavit and I'll deal with it." The judge also stated that Jaime Catano had no standing to intervene. Later, Jaime Catano's counsel again orally moved the court to participate in the hearing. Again the judge stated, "I told you to make a motion. I told you to support your motion. You get a motion. I'll rule on it.... But two days have gone by, I have no motion, the matter is between Mr. Murray and the government." After the hearing concluded and the trial began, Jaime Catano served a "Motion for Relief" on the government with a two-page unsigned affidavit attached which purported to be from Jaime Catano. The motion asked that the charges against Jaime Catano be dismissed or, in the alternative, "that the agreement with the government between Catano, Michael Murray and the other defendants be enforced." Jaime Catano's "affidavit" alleged that a DEA special agent contacted him and urged him to cooperate "which would result in a sentence for me of less than five years since Michael Murray would get no more than five years for his sentence." The affidavit also alleged that "when Michael [Murray] told me that the government wasn't going to give him the zero to five year deal after he set up the fentanyl lab, I told [the special agent] that he was going to have to give Michael and the rest of us our deal if he wanted me to cooperate." The affidavit conspicuously fails to allege that Jaime Catano actually cooperated or detrimentally relied in any way. The government disputes that this motion and affidavit were ever filed in the district court. On appeal, Jaime Catano does not argue that the district court wrongfully denied the motion, only that the district court wrongfully denied him participation in Michael Murray's hearing.
 
 
 13
 This argument fails for two reasons: (1) as discussed above, Jaime Catano did not timely move the court in writing for participation in Michael Murray's hearing as the court requested; and (2) Jaime Catano had no standing to intervene as he had shown neither an agreement intended to benefit him directly or as a third-party beneficiary,[2] nor any cooperation or detrimental reliance on his part. See United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir.1994) (holding that a criminal defendant is not entitled to an evidentiary hearing unless he "allege[s] facts that, if proven, would entitle him to relief"). In short, "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Franks v. Delaware, 438 U.S. 154, 171 (1978) (challenge to the validity of an affidavit supporting a search warrant). Jaime Catano's attack is neither.
 
 
 14
 IV. LEONEL CATANO'S OBJECTION TO THE PROCEDURE FOR
 
 PEREMPTORY CHALLENGES
 
 15
 Leonel Catano argues that the district court erred in its management of peremptory challenges by reconstituting the venire after Catano had already exercised his peremptory challenges, without permitting Catano a chance to strike any of the new veniremen.
 
 
 16
 The court used a "jury box" system of jury selection. See generally 8A James Wm. Moore, Moore's Federal Practice p 24.05 (2d ed. Feb.1995 rev.). First, the court asked the entire venire questions to determine whether there were any reasons that particular jurors could not be impartial. Several jurors were excused at this point, so that the venire dwindled to twenty-seven people. The court announced it would impanel fourteen people--enough for twelve jurors and two alternates--then permit each side to make peremptory challenges. The court would refill the box with new veniremen to replace the challenged veniremen until both sides had used their challenges or were satisfied with the panel. The government would have seven peremptory challenges and the defendants eleven. Fed.R.Crim.P. 24(b) and (c). The last two jurors to remain unchallenged would be the alternates. The government exercised four strikes on the first panel, then the defendants exercised seven. The court filled the eleven seats left vacant by the strikes with new veniremen for round two. The defense challenged four of these eleven, and the government challenged two. Thus, after two rounds a total of eight jurors had been selected, and the defendants had used up all their challenges.
 
 
 17
 At this point there were not enough remaining veniremen to refill the jury box. Therefore, the court called the remaining two veniremen into the box, and the government chose not to challenge them. Of necessity, the court called for new veniremen to be brought in from the jury pool. Since the defendants were out of peremptory challenges and the government declined to exercise its remaining challenge, all four of these new veniremen were impaneled. However, the defendants objected to one of these jurors, arguing that they had no chance to challenge him. The court replied that the defendants had simply used up their allotted number of strikes, and that the court would not allow them extra challenges.
 
 
 18
 After the jury had been selected, there was a delay before trial while the court conducted motion hearings. It happened that during this hiatus the court had to excuse two of the jurors. It decided to impanel four new alternates, making the two previous alternates deliberating jurors. The court gave each side two peremptory challenges to use on this supplementary jury selection.
 
 
 19
 Leonel Catano argues that the court's system was unfair, apparently because he had no opportunity to strike any of the veniremen in the third round of the regular jury selection and these included new veniremen not in the original venire. His argument is unfounded. The district court has substantial discretion to regulate the use of peremptory challenges within the framework of Federal Rule of Criminal Procedure 24(b). See United States v. Cox, 752 F.2d 741, 748 (1st Cir.1985). After the initial voir dire and before the court filled the jury box for the first round, the venire had dwindled to twenty-seven people. The court announced at the outset that the government and defendants together would have eighteen peremptory challenges. Twelve jurors and two alternates were needed. Simple arithmetic made it apparent at the outset that the court might have to call more veniremen to get enough for the jury. The defendants used up their peremptories on the original venire, without knowing who might walk in the door next. Having created their own predicament, they have no cause to complain.
 
 
 20
 Though his argument is unclear, Leonel Catano also appears to object to the court's procedure when events after the initial jury selection made it necessary to select more alternate jurors. The court announced it would give the defendants two additional challenges because of this new development, but that the challenges could only be used on newly impanelled jurors, not those already seated. Leonel Catano argues that the court should have permitted the use of the new challenges to strike the old jurors, two of whom were initially designated alternates but now would be deliberating jurors. The court did not anticipate that it would be necessary to supplement the jury when the panel was initially chosen. When unexpected events made it necessary to impanel new alternates, there was no reason the court should have to open up the existing panel to new challenges. This is not a case like United States v. Sams, 470 F.2d 751, 755 (5th Cir.1972), in which the defendant was surprised by an unannounced rule that prevented him from striking the first group of jurors in later rounds. Here, the defendants understood the system initially employed. If the court had not impanelled additional alternates (which was undoubtedly in its discretion), the remaining twelve jurors would have deliberated and Leonel Catano would have no argument. Catano's complaint arises out of the fact that the court impanelled more alternates out of caution and Catano wants to benefit from this chance occurrence by using the new challenges on the old jurors. Catano's argument is foreclosed by Fed.R.Crim.P. 24(c), which states that the "additional peremptory challenges [given when the court impanels alternates] may be used against an alternate juror only." We will not hamstring the district courts in dealing with unanticipated events during trial. The district court did not abuse its discretion in the jury selection process.
 
 
 21
 V. LACK OF INSTRUCTION DEFINING "REASONABLE DOUBT"
 
 
 22
 The appellants argue that the district court erred in refusing to instruct the jury on the definition of "reasonable doubt" in his instructions to the jury. This court has specifically held that the district court has discretion whether to define "reasonable doubt". United States v. Cassiere, 4 F.3d 1006, 1024-25 (1st Cir.1993); United States v. Olmstead, 832 F.2d 642, 644-46 (1st Cir.1987), cert. denied, 486 U.S. 1009 (1988). Moreover, we find support for this rule in the Supreme Court's recent decision in Victor v. Nebraska, 114 S.Ct. 1239, 1248 (1994). See United States v. Neal, 36 F.3d 1190, 1202-03 (1st Cir.1994). If the court instructs that the burden of proof is "beyond a reasonable doubt," and if the instruction is prominent, not "buried as an aside," there is no error. Olmstead, 832 F.2d at 646. The district court instructed on the requirement of proof beyond a reasonable doubt many, many times, and with appropriate gravity and emphasis. There is no error here.
 
 
 23
 VI. JAIME CATANO'S CONVICTION FOR CONTINUING CRIMINAL ENTERPRISE
 
 
 24
 Jaime Catano attacks his conviction for continuing criminal enterprise on the grounds that the court did not properly instruct the jury on the elements of CCE and that there was insufficient evidence to convict him.
 
 A. Jury Instruction
 
 25
 Jaime Catano contends that the district court failed to properly state the elements of the continuing criminal enterprise count against him in that it failed to state that the continuing series of crimes committed by the defendant must be "related."[3] Jaime Catano concedes that the standard of review is plain error, since he failed to object at trial.
 
 
 26
 The instruction comported with the statutory CCE requirement as it has been defined in this circuit. See United States v. Chagra, 653 F.2d 26, 27-28 (1st Cir.1981), cert. denied, 455 U.S. 907 (1982). Jaime Catano's citation of Garrett v. United States, 471 U.S. 773 (1985), does not convince us that the Supreme Court has found an additional requirement in the statute. Other circuits have used the "related" language without discussion. See, e.g., United States v. Phillips, 664 F.2d 971, 1013 (5th Cir.1981), cert. denied, 457 U.S. 1136 (1982); United States v. Jones, 801 F.2d 304, 307 (8th Cir.1986). However, the lack of controlling authority and the fact that the predicate crimes here were shown by overwhelming evidence to be related anyway, makes it impossible for us to find plain error resulting in a miscarriage of justice.
 
 B. Sufficiency of Evidence
 
 27
 Jaime Catano also contends that the government presented insufficient evidence to convict him on the CCE count. To convict Jaime Catano for engaging in a continuing criminal enterprise, the government must prove beyond a reasonable doubt that he: (1) committed a felony drug offense, (2) as part of a "continuing series of violations," (3) "in concert with five or more other persons" whom Jaime Catano organized, supervised, or otherwise managed, (4) and from which he obtained "substantial income or resources." 21 U.S.C. Sec. 848(c) (1988); United States v. Hahn, 17 F.3d 502, 506 (1st Cir.1994). Jaime Catano contends only that insufficient evidence existed to satisfy the "substantial income" requirement.[4]
 
 
 28
 On a sufficiency of the evidence claim, we view the evidence in the light most favorable to the verdict. United States v. Torres-Maldonado, 14 F.3d 95, 100 (1st Cir.), cert. denied, 115 S.Ct. 193 (1994). The substantial income requirement is intended "to exclude trivial amounts derived from occasional drug sales," United States v. Roman, 870 F.2d 65, 75 (2d Cir.), cert. denied, 490 U.S. 1109 (1989) (citation and internal quotation marks omitted), quoted in Hahn, 17 F.3d at 507, and may be proven directly (by evidence of revenue and resources) or circumstantially (by evidence of Jaime Catano's role in the conspiracy and the volume of drugs the conspiracy handled). Hahn, 17 F.3d at 507. The evidence "need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence." United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir.1991) (citations omitted); Hahn, 17 F.3d at 506.
 
 
 29
 Here, the conspiracy involved tons of marijuana, lasted several years, and generated millions of dollars.[5] The scale of the proven conspiracy along with Jaime Catano's uncontested role in it "provides ample basis for a reasonable inference that [Jaime Catano] realized far more than trivial amounts of income" from his involvement. Hahn, 17 F.3d at 507.
 
 VII. MICHAEL MURRAY'S SENTENCE
 
 30
 Michael Murray argues that the district court erred in sentencing him because: (1) the court did not order an offense level decrease for his acceptance of responsibility under USSG Sec. 3E1.1 (Nov.1993); and (2) the court did not order specific performance of the government's "promise" in the plea offer to depart downward for his alleged cooperation.
 
 A. Acceptance of Responsibility
 
 31
 The sentencing court has great discretion in deciding whether to grant an adjustment for acceptance of responsibility, United States v. Ruiz, 47 F.3d 452, 455 (1st Cir.1995), because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." USSG Sec. 3E1.1, comment. (n.5). We review that evaluation for clear error. Ruiz, 47 F.3d at 455. See USSG Sec. 3E1.1, comment. (n.5) (sentencing judge entitled to "great deference on review").
 
 
 32
 Guideline section 3E1.1 serves two purposes: to recognize sincere remorse and to reward a defendant for saving the government the trouble and expense of proceeding to trial. Ruiz, 47 F.3d at 455; USSG Sec. 3E1.1, comment. (n.2). The guideline commentary notes that "[i]n rare situations," a defendant can proceed to trial and receive a reduction under section 3E1.1. USSG Sec. 3E1.1, comment. (n.2). For example, a defendant may receive a reduction after going to trial "to assert and preserve issues that do not relate to factual guilt (e.g. to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." Ruiz, 47 F.3d at 455. Here, however, Michael Murray did not plead guilty, but rather tried his case "on the basis of reasonable doubt," Michael Murray's Br. at 42, thus contesting his factual guilt. We will generally sustain a district court's refusal to grant a reduction for acceptance of responsibility when the defendant does not plead guilty. Ruiz, 47 F.3d at 456. We do so here.
 
 B. Substantial Assistance
 
 33
 Michael Murray next argues that the district court erred in denying his request for a downward departure due to his substantial assistance to the government. USSG Secs. 5K1.1, p.s. (Nov.1993). He contends that either the government should be compelled to file a 5K1.1 motion because of his actual assistance, or that the district court should have deemed such a motion filed despite government inaction. Both arguments fail.
 
 
 34
 Section 5K1.1 conditions departure upon a government motion. This condition "gives the Government a power, not a duty, to file a motion when defendant has substantially assisted." Wade v. United States, 504 U.S. 181, 185 (1992). See United States v. Raineri, 42 F.3d 36, 44 (1st Cir.1994) (holding that because a 5K1.1 motion is discretionary, "the government may choose to insist on quite a lot of assistance if it wants to do so"), cert. denied, 115 S.Ct. 2286 (1995). Absent a "substantial threshold showing" of unconstitutional governmental motive for refusal to file a 5K1.1 motion, "a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy." Wade, 504 U.S. at 186. Michael Murray has alleged no unconstitutional motive and is not entitled to a remedy for the government's refusal to file a 5K1.1 motion.
 
 
 35
 Finally, Michael Murray argues that his assistance to the government was to a degree "not adequately taken into consideration by the Sentencing Commission." USSG Sec. 5K2.0, p.s. (Nov.1993). We have held that "it is theoretically possible, albeit unlikely" that substantial assistance would be an extraordinary mitigating circumstance within the ambit of section 5K2.0. United States v. Romolo, 937 F.2d 20, 25 (1st Cir.1991). However, this is not "the rare case where governmental intractability in the face of overwhelming evidence of enormously fruitful cooperation might fairly be said to have deprived a defendant of his due." United States v. La Guardia, 902 F.2d 1010, 1018 (1st Cir.1990) (refusing to depart downward under section 5K1.1 although defendants cooperated where government did not file motion). In sentencing Michael Murray, the district court recognized its authority to depart below the guideline range, but declined to do so. That decision is not appealable. United States v. Field, 39 F.3d 15, 21 (1st Cir.1994), cert. denied, 115 S.Ct. 1806 (1995).
 
 
 
 *
 Of the Eighth Circuit, sitting by designation
 
 
 [1]
 The typewriter and telephone books are relevant in light of Michael Murray's comments in a video taped conversation with other conspirators that he would make bills of lading with a typewriter
 
 
 [2]
 In fact, Michael Murray's affidavit and the prosecutor's testimony both indicate that any agreement entered into between Michael Murray and the government did not extend to Jaime Catano
 
 
 [3]
 The court's CCE instruction stated in relevant part:
 In order for Mr. Jaime Catano to be found guilty of a continuing criminal enterprise, the government must prove five things beyond a reasonable doubt.
 First, that Mr. Jaime Catano committed the offenses of conspiracy, possessing marijuana with intent to distribute it, and attempted possession of marijuana with intent to distribute it, all as charged, for the counts that charge him, in Counts 1, 2, 3 and 5.
 Second, that these offenses were part of three or more offenses committed by Mr. Jaime Catano over a definite period of time in violation of the federal narcotics laws....
 
 
 [4]
 Jaime Catano appeals both the denial of his motion for judgment of acquittal and the sufficiency of the evidence supporting his conviction. These challenges "raise a single issue," United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir.1991); we address them as one
 
 
 [5]
 Witnesses at trial detailed the transportation and distribution of six loads of marijuana from Texas to Boston over a three year period. Richard Baker described stashing and later retrieving a large gym bag stuffed with ten and twenty dollar bills. He then left Murray and Jaime Catano alone for approximately half an hour, after which Michael Murray and Jaime Catano drove away with the bag and its contents. Other witnesses testified that the DEA seized $1,149,650 from the tractor-trailer used in the conspiracy